Devoy and another, Plaintiffs in error, vs. THE STATE, De-
fendant in error.

*April 21—May 10, 1904.*

*Criminal law and practice: Rape: Evidence: Dismissal as to one
count.*

1. To establish the crime of rape the utmost reluctance on the part
   of the prosecutrix must be shown, and it must also appear that
   she availed herself of every reasonable opportunity to make
   the utmost resistance in repelling the assailant and preventing
   him from accomplishing his purpose.
2. Testimony of the prosecutrix, when asked to describe what re-
   sistance she made, that she fought defendants all the time, is
   *held* to be of no probative force, being merely a conclusion and
   not a statement of what actually took place.

3. Where an information contained two counts, one charging rape
and the other a lesser offense, and the evidence was insufficient
to establish the rape, the court, on motion, should have dis-
missed defendants from further prosecution under that count.

ERROR to review a judgment of the circuit court for She-
boygan county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiffs in error were informed against and con-
victed of the crime of rape. The offense is alleged to have
been committed on the person of one Clara Kuhn on the 4th
day of July, 1903, at the village of Elkhart Lake, in Sheboy-
gan county. The facts and circumstances of the offense, as
testified to by the complaining witness, Clara Kuhn, are as
follows:

At the time in question, she was within two months of
eighteen years of age, and resided with her parents on a farm
near the village of Elkhart Lake, where, excepting about one
month in the spring of 1903, when she worked for a Mr.
Schumacher, residing at Plymouth, she had spent her life as
a member of a large family of brothers and sisters. In the
afternoon of July 4th, she went to the village with her brother
John, and spent the afternoon with acquaintances. In the
evening she went with some friends to a public ball held at
Lauer's Hall, in the village. She had never attended a ball,
and had never attempted to dance before this evening. After
having been at the ball for some hours, the plaintiff in error
*Loughlin* asked her to join him in a dance, and she assented.
They were strangers, and there met for the first time and
without an introduction. After the dance, *Loughlin* asked her
if she would partake of any drink, and she said she would
take some pop, which was served to her, while in *Loughlin's*
company, by the barkeeper in the hall. After partaking of a
little of it, she left the rest, because, as she states, "I felt
strange," and "it tasted bitter." Immediately thereafter upon
his invitation, she accompanied him out of the hall, walk-
ing arm in arm. They were observed by others as they passed

along the sidewalk for about half a block, passing Gerhardt's place near the end of it, which was open and had lights burning. They then turned north for a short distance, and stepped off the sidewalk near the railroad track. In walking to this place from the hall she told him to let her go. No attempt was made by her to get away from him or to call for assistance from persons who were within hearing distance. When near the track, and while alone with him, she states that he pushed her over by laying hold of her arm, and that he then got down beside her, holding her around the waist with both arms. She states that her hands "weren't quite free—he held them fast a little"—and he then pulled up her clothes. This was their position at the time she says *Devoy* walked up to them. Up to this time she testifies that she tried to keep him from doing what he did by pushing and protecting herself with her hands. She said nothing to him, nor did she call to others or cry out for help, and made no other efforts to release herself from his embraces. While lying in this position, she states, the other plaintiff in error, *Devoy,* appeared, sat upon the ground beside them, and put his hand over her mouth, and that then *Loughlin* had intercourse with her, and that *Devoy* had intercourse with her. She did not cry out, because *Loughlin* told her not to or else he would give her something, but kept fighting them off all the time. When *Devoy* appeared, she did not know who he was nor did she know that he was a friend of *Loughlin.* She said nothing to *Devoy* and did not call upon him for help when she saw him approaching. After getting up from this place she walked with *Loughlin,* arm in arm as before, with one arm free, upon the sidewalk for some distance to a yard next to a church, where he again pushed her down in the same manner as before, and *Devoy* again came; and she states that both parties again had intercourse with her without her consent. She testifies to no effort to release herself from *Loughlin* in going from the place near the track to the yard near the church; that she passed dwell-

ing houses, and knew that she was within about eight feet of
one near the church, and within six feet of the sidewalk
whereon she heard persons pass.   She made no outcry and   .
gave no alarm, nor did she remonstrate by word to either of
the accused parties.   After arising from the ground, she ad-
mits stepping aside, up nearer the house and away from them,
to arrange her garments, but she made no effort to call for
help or to give any alarm.   From there she again walked with
*Loughlin* back in the direction from which they first started,
locking arms as before.   She walked with him until they came
near the shop of a Mr. Kissinger, when she got away from
him, went a short distance, and there met a girl friend, with
whom she went to Anderson's Hall, where she met some
young people, drank some pop with them, remained about a
quarter of an hour, and then went with this girl friend to
Lauer's Hall.   Upon arrival there, she went to a side room
with friends, who then apprised her that the back of her gar-
ments were soiled, and she told them that two men had fol-
lowed and had her.   She made like statements to Mrs. Lauer
and her brother at Mrs. Lauer's place.

In addition to these facts, nothing appeared to show that
complainant showed signs of excitement or marks or bruises
of any violence on her person, nor did her garments indicate
that they had been torn or displaced in a struggle or contest.
On cross-examination, she stated that while she and *Loughlin*
were on the ground near the railroad track he took a pocket
knife from his trousers, opened the blade, held it up, and then
closed it and replaced it in his pocket; that he said nothing
concerning it, and did not apply it in any dangerous or un-
usual way; and that she did not speak to him about it.

At the conclusion of the testimony, plaintiffs in error each
made a motion that they be discharged from the charge of
rape upon the ground that the evidence was not sufficient to
establish this offense in the law.   The court overruled the
motion.   They separately excepted, and sued out this writ of

error for a review of the proceeding and the judgment in the case.

For the plaintiff in error *Devoy* there was a brief by *H. J. Rooney;* for the plaintiff in error *Loughlin* a brief by *D. T. Phalen;* and the cause was argued orally by *H. J. Rooney.*

For the defendant in error the cause was submitted on the brief of the *Attorney General* and *L. H. Bancroft,* first assistant attorney general.

SIEBECKER, J.    The essential ingredients constituting the crime of rape are so definitely established by the adjudications of this state that a reference to former decisions will be sufficient to show the nature and character of the offense. The terms of the statute defining the offense, in their legal equivalent, mean that if any person has sexual intercourse with a female over the designated age by force, without her consent and against her will, he shall be guilty of this offense. In *Connors v. State,* 47 Wis. 523, 2 N. W. 1143, it is stated:

"Voluntary submission by the woman while she has power to resist, no matter how reluctantly yielded, removes from the act an essential element of rape." "If the carnal knowledge was with the voluntary consent of the woman, no matter how tardily given, or how much force had been theretofore employed, it is no rape."

The ingredient which gives the offense its atrocious character is the violation of the woman's person under circumstances while exerting the utmost power in protection of herself. Utmost reluctance must be shown, and it must also appear that she availed herself of every reasonable opportunity to make the utmost resistance in repelling the assailant and preventing him from accomplishing his purpose. Under the circumstances of such an attack, a passive demeanor on her part is not sufficient to show utmost resistance, if she was sufficiently possessed of her mental faculties to apprehend her danger and to control her physical powers in her defense.

There is nothing disclosed by the evidence which takes this case out of the class of cases wherein the prosecutrix should have continued her resistance and dissent to the last. It fails to show that her will was overcome by threats or fear, or that she was not in possession of all her mental faculties, when the outrage is alleged to have been committed. An exhaustive and observant reading of the evidence in the case shows the following facts:

The prosecutrix admitted that she had never met the accused, *James Loughlin,* before this evening; that she met him at the ball at a late hour, and accepted his invitation to accompany him alone for a walk in the streets of the village; that she became apprised of his purpose within a few minutes after leaving the hall; that she was at this time in close proximity to occupied buildings, and within such a distance of Lauer's Hall that a call for help would in all probability have reached the persons whom they had passed on the sidewalk, near the entrance of the hall, a few minutes before. Yet she was absolutely silent, and gives no other explanation than that *Loughlin* told her to keep still. The evidence also fails to show that she made efforts to escape from him in walking to and after stopping near the railway tracks, where she claims he threw her to the ground and held her down until *Devoy* arrived. She made no outcry and spoke no word of protest. Her silence is confirmed by the evidence of witnesses who were upon the street at such a distance that a cry of alarm could have been heard by them. Her whole testimony at this time is devoid of anything showing that she used her capacities to resist such an attack, when her powers to act were neither stupefied nor seriously interfered with through force or threats by the assailant.

The *gravamen* of the offense is said to be shown by the events immediately following the compromising situation just referred to, after *Devoy's* appearance upon the scene. She testifies that *Devoy* sat down beside them and held his

hand over her mouth while *Loughlin* had intercourse with her, that no word was spoken, and that she tried to push them off with her hands. The statement by her that, immediately after *Devoy's* arrival, *Loughlin* removed the garment from next her body, before *Devoy* put his hand over her mouth, and that she made no outcry then, nor resisted these advances in any way, except to push with her hands, is significant as showing a want of the utmost resistance on her part, and a failure to call for aid under circumstances so alarming to her safety. She further testifies that, after *Devoy* left them at this place, she walked with *Loughlin* on the street, going arm in arm as before, until they arrived at the lawn of a dwelling house near a church; that while on the lawn, a few feet from the dwelling house and about six feet from the side-walk, *Loughlin* again pushed her to the ground, and that *Devoy* then appeared again; and that they committed another rape upon her. The surroundings of this occasion show that an ordinary outcry would have attracted the attention of persons in the immediate vicinity, but she testifies that she gave no alarm, though she had opportunity to do so; nor does she offer any explanation why she made no attempt to escape from *Loughlin* while on the streets in going to this place, or after they were on the lawn and before *Devoy* appeared. It is undisputed that two of the witnesses called upon the trial passed near by, over the sidewalk, while she was on the lawn with both persons, and that she heard them pass and go into the adjoining yard, but made no effort to attract their attention. In explanation of this silence, she testifies that *Loughlin* told her that if she did not keep still she knew what he would do to her. The two witnesses testify that they observed the persons lying on the lawn in a compromising situation; that they went into the adjoining yard to get their buggy, and while there noticed these persons get up; and that the prosecutrix arose, stepped near the building alone, and seemed to arrange her wearing apparel, and then went away with one

of the men. They testify that nothing occurred indicating a struggle, and that no alarm of danger or call for assistance was given. Her testimony, in effect, corroborates the fact that she did nothing to attract their attention. According to her statement of events immediately succeeding this, she again accompanied *Loughlin* on the streets, going back in the direction whence they had come, locking arms as before. She walked with him without protest until they were near the shop of a Mr. Kissinger, when she got away from him, and within a short distance met a girl friend, with whom she went to Anderson's Hall, where she met several young women, conversed with them, and drank some pop. About a quarter of an hour thereafter she went to Lauer's Hall with this girl friend. At this place she was informed that the back of her garments was much soiled, and she then stated to Mrs. Lauer and others that two men had had her. She then inquired for her brother, and shortly started for home with him, and upon arriving there, about 3 o'clock in the night, she retired until morning. She spoke to her brother of the affair on the way home, and the next day told her mother about it.

Giving to these events and her acts and conduct the most favorable inference, they fail to show the essentials requisite to the crime charged. "It must appear that she showed the utmost reluctance and used the utmost resistance." *Don Moran v. People,* 25 Mich. 356. Searching the evidence to find what resistance the prosecutrix made, we find her statement that she tried to push them off with her hand, and, when asked to describe what was done by her, she replies that she fought them all the time. The court seems to have laid some stress upon this answer. It is, however, of no probative force. It is merely a conclusion of the witness upon a subject involving her conduct, when the court should have insisted upon a statement of what actually took place, and let the jury find from the evidence in what respect and to what extent she fought them, in determining the ultimate question of what resistance

she made. Looking into the record to find what reluctance she exhibited, we find no proof "of those symptoms of alarm or intense mental anguish or physical resistance that would be reasonably expected of a woman under such circumstances, in order to protect herself from a most grievous and impending outrage." *Bohlmann v. State,* 98 Wis. 617, 74 N. W. 343.

. The evidence is insufficient to establish the crime of rape, and the court should have granted the motions of the plaintiffs in error, dismissing the case as to this charge, and have submitted it upon the count supported by the evidence. A decision of these motions entitled the plaintiffs in error to the judgment of the court upon the question whether the evidence, in any view, could be held to establish the crime of rape, and, if it failed, it devolved upon the court to withdraw this charge from the consideration of the jury, and to dismiss them from further prosecution under this count of the information. The error necessitates a reversal of the judgment in the case.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded for a new trial; and the warden of the state prison and the superintendent of the Wisconsin state reformatory are respectively directed to deliver *Edward Devoy* and *James Loughlin* to the sheriff of Sheboygan county, who is directed to keep them in custody, subject to further proceedings according to law.