[Crim. No. 792.   Second Appellate District, Division Two.—November 7, 1921.]

THE PEOPLE, Respondent, v. JAMES M. NORRINGTON, Appellant.

[1] CRIMINAL LAW—APPEAL—JURISDICTION—QUESTIONS OF LAW.—On an appeal from a judgment of conviction, the jurisdiction of the appellate court extends only to questions of law, and it must accept as proven the facts as detailed by the witnesses for the state.

[2] ID.—ASSAULT WITH INTENT TO COMMIT RAPE—EVIDENCE—CREDIBILITY OF TESTIMONY OF PROSECUTRIX.—In this prosecution for an assault with intent to commit rape, the testimony of the prosecutrix is not so intrinsically incredible as to justify the disturbance of the verdict.

[3] ID.—CONVICTION ON UNCORROBORATED TESTIMONY OF PROSECUTRIX. In a prosecution for an assault with intent to commit rape, a conviction may rest upon the uncorroborated testimony of the prosecutrix, if she be believed by the jury, and the degree of credibility which should be given to her statements and the weight to be accorded her testimony are matters to be addressed solely to the discretion and consideration of the jury.

---

3. Necessity and sufficiency of corroboration of prosecutrix in prosecution for rape, notes, 6 *Ann. Cas.* 771; 17 *Ann. Cas.* 413; *Ann. Cas.* 1913D, 660.

[4] ID.—APPEAL—PRESUMPTION AS TO VERDICT.—In the absence of something in the record upon which to base a contrary opinion, an appellate court must assume that the jury reached their verdict with a full realization of their sworn duty, free from passion and prejudice.

[5] ID.—ORDER DENYING NEW TRIAL—AFFIRMANCE ON APPEAL.—An order denying a motion for a new trial in a prosecution for an assault with intent to commit rape will not be disturbed on appeal unless there is found in the record a full justification for the belief that the verdict was the expression of passion and prejudice rather than of deliberate judgment.

[6] ID. — ABSENCE OF OUTCRY — EFFECT OF. — Though the absence of outcry may have a tendency to refute the hypothesis of guilt, it is by no means conclusive.

[7] ID.—CONSUMMATION OF CRIME.—If the prosecutrix resisted, and if, for an instant during the assault and the prosecutrix's resistance, the defendant intended to overcome her resistance by force or violence, he is guilty of assault with intent to commit rape.

[8] ID. — PROOF OF CRIME — DUTY OF STATE. — It is essential in a prosecution for assault with intent to commit rape that the state beyond proving the assault should prove every fact necessary to constitute rape, except penetration.

[9] ID.—SUFFICIENCY OF EVIDENCE.—In this prosecution for assault with intent to commit rape, the verdict is supported by the evidence.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Paul J. McCormick, Judge. Affirmed.

The facts are stated in the opinion of the court.

Guy Eddie for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, and R. L. Chamberlain for Respondent.

FINLAYSON, P. J.—Defendant, who was convicted of an assault with intent to commit rape, appeals from the judgment and from an order denying his motion for a new trial. The appeal presents the single question as to whether the evidence is sufficient to justify the verdict, defendant claiming that the testimony of the prosecutrix is inherently improbable, and that she did not resist to the utmost of her ability.

There is an irreconcilable conflict between the testimony of the prosecutrix and that given by the defendant. [1] But, since our appellate jurisdiction extends only to questions of law, we must accept as proven the facts as detailed by the witnesses for the state. As was said by our supreme court in *People* v. *Emerson*, 130 Cal. 562 [62 Pac. 1069], "if the evidence which bears against the defendant, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law—of which alone this court has jurisdiction—and becomes one of fact upon which the decision of the jury and the trial court is final and conclusive."

About midnight of August 18, 1920, the prosecutrix, a married woman, forty years of age, and who resided with her husband in Los Angeles, left Long Beach for her home. She arrived in Los Angeles, alone, shortly before 1 o'clock in the morning. After standing for a considerable length of time on a street corner waiting for a street-car to take her home, she finally accosted the defendant, a police officer in uniform, wearing his star or badge, and sought from him information regarding the street-car that would take her nearest to her home, which was not far from the intersection of Vermont Avenue with Ninth Street. Defendant, who was just off duty, volunteered to take her home in his automobile, which, at that time, was in a garage on Grand Avenue, between Eighth and Ninth Streets. The offer was accepted; the prosecutrix and defendant went to the garage, and presently the two drove away in defendant's car. After proceeding south on Grand Avenue to Ninth Street, they turned into the latter street and traveled westerly for a distance about half way between Grand Avenue and Vermont, when defendant, against the remonstrance of the prosecutrix, turned his car northerly and drove to Wilshire Boulevard, where he again turned and proceeded along that thoroughfare in a westerly direction, across Vermont Avenue, until he finally brought his car to a stop on Wilshire Boulevard at a point between one-quarter and one-half mile west of Western Avenue, and which, the prosecutrix testified, was "beyond any signs of habitation, . . . beyond the residential district." The nearest dwelling, she thought, was distant about six hundred yards. After stopping his car at the edge of the road,

defendant switched off the lights. As the car came to a stop, another automobile passed by, traveling in a westerly direction. Just before this other vehicle passed, defendant, addressing the prosecutrix, said: "Don't you dare to speak or make any outcry when this machine passes. Don't you dare to." What took place after this is described by the prosecutrix substantially as follows: "After the car came to a stop [i. e., defendant's car] the defendant took me by the elbows, lifted me bodily, and slid under me, endeavoring to place me on his lap; and it was necessary to think very quickly, and to the best of my ability; I realized I was in quite a predicament and that I must not lose my head, so I opened the door and stepped out on to the ground. I moved toward the front of the car—about two or three feet beyond the front of the car. Defendant followed me immediately and came up to me. I again begged him to take me home. I talked very loud, as loud as possible—probably louder than I have ever talked in my life or have been able to—and when I started to do that he took me by the back of the neck, in the crook of his elbow, and put his right hand over my mouth and pushed my head back just as far as he could. He seemed very nervous, and kept saying, 'sh-sh-sh.' It was quite a shock to my nerves. However, I did not lose consciousness. His right hand was over my mouth, forcing my head back. I then went toward the middle of the car, in front of the rear side door. The defendant followed me to that position. I kept begging him to take me home; I spoke of my husband several times. Defendant kept repeating, 'I will take you home, I will take you home, but not until I am completely satisfied.' He stated that he would have intercourse with me in some way or other. He raised my skirts nearly up to my hips. Meanwhile he held my left arm up in the air with his right hand. He was facing me and I was leaning or standing against the back of the car, that is, not touching it but standing right in front of it with my back to the door. I had on a union suit. It was worn. I had been wearing it since morning, and had had no opportunity to change it. It had been worn with circular holes through rubbing and wear. In reaching under my skirts the first time he grabbed through one of these holes that had been worn in this old union suit and tore it. Then he reached

again. I had on an under-napkin. He reached with such violence that he pulled the pin out of this napkin so that the pin was bent. He threw the pin over into the front of the car. The napkin was torn loose. It was left hanging after he had reached under with his left hand and jerked the pin out. Defendant's trousers were open and his private parts exposed. He informed me that he was going to be satisfied before he took me home. I told him that I felt sure he would have to wait some time if he waited for that to be accomplished, because I certainly would defend myself, if possible. Then he made another attempt to enforce his intentions, and I simply talked to him and spoke again that I must get home. I was trying to use suggestion, thinking that would perhaps influence him to take me home. He said, 'I think I will just take you over under the bushes here on the grass.' I replied that he could not budge me from the spot where I stood. Then he proceeded to attempt to make the insertion there where I stood. He pushed me violently against the car sixty or sixty-five times, striking his penis against the tab of my sanitary belt from which he had removed the cloth by jerking the pin loose. While he was doing that I saw my opportunity to get his badge and I unpinned it and took it from his coat. I was endeavoring to fight him off as best I could. He did not make any penetration, but after about sixty violent strokes against my body something happened—he had an emission. Then it was that he relaxed his hold on me, and I stepped to one side. Then I again asked him to take me home, and finally he consented, and drove east toward Western Avenue. He took me to Ninth and New Hampshire, and then I recognized that we were about a short block from where I lived. From there I walked home. It was about twenty-five minutes to 5 in the morning when I arrived home. I told my husband what had happened."

[2] We are unable to say that the testimony of the prosecutrix is so intrinsically incredible that the court should interpose to disturb the jury's determination. Her manner and deportment on the witness-stand, as well as her apparent appreciation or lack of appreciation of the consequences of her testimony, are tests of her truthfulness of which we, as a reviewing court, are deprived. [3] It is well settled by the decisions of the supreme court

and appellate courts of this state that in cases of this character a conviction may rest upon the uncorroborated testimony of the prosecutrix, if she be believed by the jury. The degree of credibility which should be given to her statements while on the witness-stand, and the weight to be accorded her testimony, are matters to be addressed solely to the discretion and consideration of the jury. (*People* v. *Mazzurco,* 49 Cal. App. 275 [193 Pac. 164].) **[4]** In the absence of something in the record upon which to base a contrary opinion, we must assume that the jury reached their verdict, with a full realization of their sworn duty, free from passion and prejudice. **[5]** Moreover, the learned trial judge, by denying the motion for a new trial, manifested his satisfaction with the sufficiency of the evidence. His opportunity to form a correct opinion as to the credibility of the witnesses, as well as the weight and effect of their evidence, is far better than ours; and his conclusions ought not lightly to be disturbed. Before we can interfere, we must find in the record full justification for believing that the verdict was the expression of passion and prejudice rather than of deliberate judgment. (*People* v. *Lewis,* 18 Cal. App. 359, 365 [123 Pac. 232].) We cannot say that such a condition is shown here.

Appellant strenuously insists that there is not sufficient evidence to warrant the inference that he was actuated by the felonious desire to commit rape; that is, it is insisted that the evidence does not warrant the inference that he intended to gratify his lust upon the person of the prosecutrix at all events and regardless of what she might or could do to prevent it. The basis for this contention is the claim that the evidence shows that the prosecutrix did not put forth all the resistance within her power for the reason that she failed to make any violent outcry. **[6]** Though the absence of such outcries may have a tendency to refute the hypothesis of guilt, it is by no means conclusive. While, from the nature of the crime, it may be expected in such cases that the utmost reluctance would be manifested, and the utmost resistance made which the circumstances of the case will allow, still, to hold, as a matter of law, that such manifestation and resistance are essential to the existence of the crime, so that it could not be committed if they are wanting, would be going further

than any well-considered case in criminal law has hitherto gone. (*State* v. *Pilegge,* 61 Wash. 264 [112 Pac. 263].)

That the defendant desired to have sexual intercourse with the prosecutrix, and that, in attempting to attain his purpose, he assaulted her, are facts shown by the testimony of the state's witness beyond all question. [7] If the prosecutrix resisted, and if, for an instant during the assault and the prosecutrix's resistance, the defendant intended to overcome her resistance by force or violence, he is guilty of assault with intent to commit rape. (Pen. Code, sec. 220, and subd. 3 of sec. 261.) In cases such as this, the intent with which the assault is committed is a fact which can only be inferred from the outward act and surrounding circumstances. It is, in other words, a question of fact for the jury and not a question of law for the court, except where the proven facts afford no reasonable ground for the inference. (*People* v. *Moore,* 155 Cal. 237, 240 [100 Pac. 688].) Here there was evidence to warrant the inference that defendant intended to accomplish his purpose by force, and that he desisted only upon the subsidence of his bestial desire following the highly excited condition to which he had wrought himself during his frantic endeavors to satisfy his lustful passion.

We are cited to a number of cases, beginning with *People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506], and ending with *People* v. *Fleming,* 94 Cal. 308 [29 Pac. 647], in which verdicts were set aside upon the ground that the evidence was insufficient to sustain the charge of rape or of assault with intent to commit rape. Those cases are reviewed in *People* v. *Moore, supra.* They have no application where, as here, all the outward facts are clearly established and the only question is as to what the defendant intended, and there is reasonable ground to infer that he intended to use his superior strength to overcome the resistance of the prosecutrix and to accomplish his purpose by main force.

The weakness of appellant's argument lies in the fact that his counsel overemphasize the necessity for extreme resistance by the woman, and overlook the effect of defendant's intent as manifested by his conduct. [8] Unquestionably, it is essential that in a prosecution for assault with intent to commit rape the state, beyond proving the

assault, should prove every fact necessary to constitute rape, except penetration. What the assailant meant to do, however, and the manner in which he intended to accomplish his purpose—whether by persuasion, force, or fear—is, as we have said, a question of fact to be determined by the jury; and an appellate court should not disturb their finding simply because conflicting inferences may reasonably be deduced from the evidence. The importance of resistance by the woman is simply to show two elements of the crime—the assailant's intent to use force in order to have carnal knowledge and the woman's nonconsent. And though, unquestionably, the jury must be fully satisfied of the existence of these two elements, it would be a reproach to the law to make the crime hinge on the utmost exertion by the woman. Our views upon this phase of the case are so admirably expressed by the Idaho supreme court in *State* v. *Neil,* 13 Idaho, 539 [90 Pac. 860, 91 Pac. 318], that we quote as follows: ''A number of authorities are cited by counsel for appellant, to the effect that the state must show in such cases that the female 'showed the utmost reluctance and used the utmost resistance.' (*De Voy* v. *State,* 122 Wis. 148 [99 N. W. 455] ) To our minds the trouble with a number of these authorities is that they reverse the order of the inquiry. They go about inquiring into the kind, character, and nature of the fight put up by the woman, rather than the nature of the assault and evident and manifest purpose and intent of the assailant. For the purpose of reaching the conclusions announced in some of these cases, it is necessary to assume that, in the first place, a man has a right to approach a woman, lay hold on her person, take indecent liberties with her, and that, unless she 'kicks, bites, scratches and screams' (*People* v. *Morrison,* 1 Park. Cr. R. (N. Y.) 625) to the 'utmost of her power and ability,' she will be deemed to have consented, and indeed to have invited the familiarity. Such is neither justice, law, nor sound reason. On the contrary, under the statute, a case might arise where a conviction could properly be had for assault with intent to commit rape, and still no personal encounter or contact have ever taken place. In fact, many such cases are reported. (23 Am. & Eng. Ency. 866, and notes; 1 McLain Cr. Law, sec. 463; 10 Ency of Ev. 607,

and cases cited.) . . . It is true that she [the prosecutrix] must not have consented, because, if she did, there would be no offense; but, on the other hand, men should not be allowed, under the protection of law, to construe every indiscreet act or word of a woman into consent to carnal knowledge, nor should they be allowed to indulge in presumptions against the virtue and chastity of women. Rather let the evil-minded man incur the risk and hazard of misjudging the opposite sex, and [*sic*] endeavoring to degrade them and destroy their peace and happiness. A little of this kind of law would go a long way with some of the brutes who unfortunately bear the names of men. There would be far less illicit intercourse, if there were no assaults by the seducer in the first place; and the oftener he is brought to justice the less annoyance the community will suffer from the graver offenses toward which his conduct leads.''

[9] From all the facts in the record before us, the jury may not unreasonably have believed that, throughout the experiences through which she passed while defendant was seeking to gratify his lascivious desires, the prosecutrix acted upon the honest belief that she best could extricate herself from her predicament by remaining calm and collected, relying upon her wits rather than by making an outcry and thus peradventure run the risk of being choked into insensibility. At any rate this is a reasonable hypothesis, and therefore, one which may have been deduced by the jury as a reasonable inference of fact from all the evidence in the case. It is quite possible that had we, and not the jurors, been the triers of the facts, we would have reached the conclusion that the prosecutrix, acting the part of a shameless wanton, was but playing upon the defendant's passions in order to gratify some unscrutable desire to tantalize him by exciting, without gratifying, his lustful concupiscence. But as we sit in criminal cases solely for the correction of errors of law, we cannot disturb the jury's determination if there be any substantial evidence upon which the verdict may find meritorious support. Whether the apparent resistance of the prosecutrix was genuine and *bona fide* was a question addressed solely to the consideration of the jurors as the triers of the facts; and we cannot say that there was no evidence to warrant

the inference that the prosecutrix offered a sincere resistance in an honest endeavor to protect her honor and virtue. Judgment and order affirmed.

Works, J., and Craig, J., concurred.