**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36841**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **2011 Opinion No. 57** |
| Plaintiff-Respondent, | ) |
| | ) **Filed: September 12, 2011** |
| v. | ) |
| | ) **Stephen W. Kenyon, Clerk** |
| RUSSELL G. JONES, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Elmore County. Hon. Cheri C. Copsey, District Judge.

Judgment of conviction for two counts of rape, <u>affirmed in part</u> and <u>reversed in part</u>.

Molly J. Huskey, State Appellate Public Defender; Sarah E. Tompkins, Deputy Appellate Public Defender, Boise, for appellant. Sarah E. Tompkins argued.

Hon. Lawrence G. Wasden, Attorney General; Elizabeth A. Koeckeritz, Deputy Attorney General, Boise, for respondent. Elizabeth A. Koeckeritz argued.

_____

GUTIERREZ, Judge

Russell G. Jones appeals from the judgments of conviction entered upon jury verdicts finding him guilty of two counts of rape. For the reasons set forth below, we affirm in part and reverse in part. More specifically, we uphold the conviction in regard to Count I and vacate the conviction in regard to Count II.

**I.**

**FACTS AND PROCEDURE**

Jones, A.S., and Craig Carpenter had been friends for approximately fifteen years in the spring of 2008. A.S. and Carpenter were engaged and had children together. However, unbeknownst to Carpenter, Jones and A.S. had been having a sexual relationship for approximately four years. On May 22, 2008, after spending the night alone together in Jackpot, Nevada, Jones and A.S. returned to A.S.'s apartment--deciding on the drive back to Idaho they

1

should end their affair. However, the next morning they engaged in consensual sex. Afterwards, A.S. went to the bathroom and when she returned to the bedroom Jones was on the computer looking at pornographic material. He sat down on the bed next to her and began to touch her. A.S. reacted by telling Jones, "[I] thought we had decided that the time before that was the last time and it wasn't going to happen anymore." Jones stopped touching her, got up, and walked around behind her. A.S. got up on her elbows and saw that Jones was unfastening his pants. She protested that she did not want to engage in intercourse, but he "leaned forward" and A.S. was "pushed down . . . to where [she] couldn't get up" and her arms were pinned beneath her body. Jones then moved A.S.'s underwear aside and had intercourse with her. Afterward, Jones apologized to A.S., asked her if she was alright, and told her that she could "press charges" if she wanted to because he was "out of line" and had "lost control." After Jones left the residence, A.S. called the Women's Center at Boise State University and spoke to a counselor. After telling the counselor that she had been raped, she was advised to call the police, which she did not do. She continued to be in contact with Jones, including going with him again to Jackpot.

Several days later on May 27, Jones came to watch movies at A.S.'s residence. Jones spent the night on A.S.'s couch and remained in the apartment after Carpenter left for work and A.S.'s children left for school. A.S. testified that during this time she was taking a prescribed anti-anxiety medication which caused her to experience marked drowsiness and had taken an over-the-counter antihistamine to treat a bee sting, which also caused her to feel drowsy. Due to her drowsiness, A.S. lay down on the couch in the living room, while Jones used the computer in her bedroom. Jones entered the living room, sat next to her, and began to stroke her hair. A.S. testified that Jones pulled her hair, but A.S. did not respond and pretended to be asleep. Jones then grabbed at A.S.'s breasts, forcefully touched her private area, and proceeded to engage in intercourse with her while she was lying on the couch and not moving. A.S. testified that she was "paralyzed by fear" and neither physically resisted Jones nor made any verbal protest. A.S. testified that she had hoped Jones would cease if she did not respond to him physically.

After the encounter, the two went to the bedroom and shared a cigarette. Jones assisted A.S. in getting into bed and again began to have sexual intercourse with her. There was no testimony by A.S. that she protested or asked Jones to stop during this second encounter, and he stopped on his own accord, stating "Baby, I do have a problem." He asked if they could resume having sex, which she refused. Jones eventually left the residence.

2

A.S. drove to Carpenter's brother's house and told him and his girlfriend that Jones had raped her. They took A.S. to the hospital, where she told staff that she had been sexually assaulted, but did not want to press any legal charges. However, law enforcement officers were contacted and A.S. provided a statement to the police while at the hospital.

On May 29, A.S. met with a detective who arranged a recorded confrontation call. On the tape, Jones is heard apologizing for both incidents, admitting to A.S. that he "continued" with the sexual acts despite her telling him no in the first instance and her not responding in the second instance, and agreeing that, after the first instance, he sent her text messages "promising [her] it wouldn't happen again." In addition, in several of the audible portions of the audio recording, A.S. can be heard to clearly say to Jones, "You think this is ok to do to people who are unconscious? Apparently you've done this to [M.C., a former girlfriend] before, and now you did it to me." Jones says, in response to A.S.'s prodding, that he was already on felony probation for domestic battery based on similar circumstances and that he would have to register as a sex offender based on A.S.'s allegations. A.S. also asked Jones to describe the "bad things" that he had done in the past, to which he responded that he had "hurt [M.C.]" and committed prior driving under the influence (DUI) offenses.

Jones was charged with two counts of forcible rape, Idaho Code § 18-6101(3)[1], based on the May 22 incident in the bedroom (Count I) and the May 27 incident on the couch (Count II). At trial, A.S. testified as to her version of the events regarding the two counts of rape and admitted that she had never informed police that she and Jones had been involved in a consensual sexual relationship for four years at the time of the incidents. She also admitted that she had given police an incomplete account of the facts when providing them with her statements--specifically, she did not tell them that she had engaged in consensual sex with Jones earlier in the day on May 22, and while she had shown officers text messages from Jones that she thought were incriminating, she did not reveal to the officers other text messages that she had sent to Jones indicating that she loved him and that would have revealed their past relationship. Additionally, A.S. admitted that as of the time of trial she was still concealing her past sexual relationship with Jones from Carpenter.

---

[1] Pursuant to a 2010 amendment, this section is now Idaho Code § 18-6101(4). The statutory references hereafter will be to the version in effect at the time Jones was charged.

3

Defense counsel cross-examined A.S. at length about a letter she had written in which she recanted her allegations of rape--which had been notarized and given to the prosecution prior to trial. In the letter, A.S. characterized the events forming the basis of her allegations of rape as a misunderstanding between her and Jones and asserted that Jones was being wrongfully charged. A.S. later sent the prosecutor another letter retracting her retraction and indicating her desire to go forward with the rape charges--a change of heart which she indicated was due to having undergone counseling.

The State presented the testimony of the registered nurse who performed the examination of A.S. on May 28. The nurse indicated that A.S. appeared frightened, was crying, spoke in a soft tone of voice, did not make eye contact, and curled up in the fetal position after the examination. The nurse also testified that she found no physical findings of trauma consistent with rape during the examination, specifically that there was no evidence of bruising, scraping, or scratches anywhere on A.S.'s body.

At one point in the trial, Jones moved that the State's recording of his May 29 phone conversation with A.S. be redacted before being played to the jury to omit any references to allegations of prior bad acts that Jones had committed against M.C., specifically the implication that Jones had engaged in sexual intercourse with M.C. while she was asleep. The district court ruled that the tape should not be redacted, stating that because Jones was on trial for forcible rape and not for rape while A.S. was unconscious, the court "didn't see how this is prejudicial."

The State's final trial witness was Detective Bob Chaney, who had met with A.S. after the incidents and had facilitated the taping of her call to Jones. While he was on the stand, the un-redacted tape was played for the jury. Detective Chaney then testified that he looked at and wrote down several text messages from Jones to A.S., which were admitted into evidence, but that he did not examine any messages that A.S. sent to Jones--including those in which she expressed her love for Jones. He was also apparently still unaware that Jones and A.S. had been engaged in a four-year consensual sexual relationship and that the two had engaged in consensual sexual intercourse earlier on May 22. The detective also testified that no physical evidence of rape had been found after completion and testing of the rape kit.

At the close of evidence, Jones moved for a directed verdict based on the failure of the State to prove that A.S. resisted sexual intercourse and that her resistance was overcome by force. The district court denied the motion. The jury convicted Jones of both counts of rape and

4

Jones was sentenced to concurrent twenty-five year sentences, with five years determinate for each count. Jones now appeals, challenging his convictions on sufficiency of the evidence grounds and on an evidentiary ruling error.

## II.

## ANALYSIS

### A.    Sufficiency of the Evidence

Jones contends that there was insufficient evidence to support the jury's verdicts on both counts because the State failed to prove, beyond a reasonable doubt, both that A.S. physically resisted Jones and that her resistance was overcome by force or violence, elements that are required by the statute.

Appellate review of the sufficiency of the evidence is limited in scope. A judgment of conviction, entered upon a jury verdict, will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Byington,* 132 Idaho 589, 593, 977 P.2d 203, 207 (1999); *State v. Johnson*, 149 Idaho 259, 263, 233 P.3d 190, 194 (Ct. App. 2010). We will not substitute our view for that of the jury as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

Jones was charged solely under I.C. § 18-6101(3) in both counts. At the time of the charged offenses, the statute provided that:

> Rape is defined as the penetration, however slight, of the oral, anal or vaginal opening with the perpetrator's penis accomplished with a female under any one (1) of the following circumstances:
> . . . .
> (3)    Where she resists but her resistance is overcome by force or violence.

As stated in the comment to Idaho Criminal Jury Instruction 904, entitled "Resistance to Rape," which was given to the jury in this case:

> In Idaho, a rape victim is not required to resist to the utmost of the victim's ability. *State v. Neil*, 13 Idaho 539, 90 P. 860 (1907). The importance of resistance by the victim is simply to show two elements of the crime--the assailant's intent to use force in order to have sexual intercourse and the victim's non-consent. *State v. Andreason*, 44 Idaho 396, 257 P. 370 (1927). *See also, State v. Fowler*, 13 Idaho 317, 89 P. 757 (1907); *State v. Lewis*, 96 Idaho 743, 536 P.2d 738 (1975); *State v. Robran*, 119 Idaho 285, 805 P.2d 491 (Ct. App. 1991); *State v. Gossett*, 119 Idaho 581, 808 P.2d 1326 (Ct. App. 1991).

### 1.    Count I

Jones contends that in regard to Count I, there was insufficient evidence to support the charge because there were no facts establishing "either physical force on the part of Mr. Jones, nor any physical resistance in any fashion on the part of [A.S.]."

#### a.    resistance

Jones contends that while A.S. testified that during the May 22 encounter she told Jones several times that she did not want to have sex with him, this evidence goes to a lack of consent, but does not, in itself, "show any proof of physical resistance on her part, nor the use of force or violence on the part of Mr. Jones." He cites to *State v. Roles*, 122 Idaho 138, 832 P.2d 311 (Ct. App. 1992) for the proposition that Idaho case law has "implicitly recognized the distinction between force and lack of consent in forcible rape." Jones contends that under Idaho case law, "while lack of consent is an implied element of rape, proof of mere lack of consent cannot substitute for actual evidence of force and resistance where the state charges a defendant with forcible rape pursuant to I.C. § 18-6101(3)."

Thus, we first examine whether there was sufficient evidence presented that A.S. "resisted" Jones as to Count I. Because it is undisputed that the only possible resistance that A.S. engaged in was verbal, the question is specifically whether Jones is correct in his assertion that the statute requires physical resistance or whether verbal resistance alone satisfies the element.

This Court exercises free review over the application and construction of statutes. *State v. Reyes*, 139 Idaho 502, 505, 80 P.3d 1103, 1106 (Ct. App. 2003). Where the language of a statute is plain and unambiguous, this Court must give effect to the statute as written, without engaging in statutory construction. *State v. Rhode*, 133 Idaho 459, 462, 988 P.2d 685, 688 (1999); *State v. Burnight*, 132 Idaho 654, 659, 978 P.2d 214, 219 (1999); *State v. Escobar*, 134

6

Idaho 387, 389, 3 P.3d 65, 67 (Ct. App. 2000). The language of the statute is to be given its plain, obvious, and rational meaning. *Burnight*, 132 Idaho at 659, 978 P.2d at 219. If the language is clear and unambiguous, there is no occasion for the court to resort to legislative history or rules of statutory interpretation. *Escobar*, 134 Idaho at 389, 3 P.3d at 67. When this Court must engage in statutory construction, it has the duty to ascertain the legislative intent and give effect to that intent. *Rhode*, 133 Idaho at 462, 988 P.2d at 688. To ascertain the intent of the legislature, not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute, and its legislative history. *Id.* It is incumbent upon a court to give a statute an interpretation which will not render it a nullity. *State v. Beard*, 135 Idaho 641, 646, 22 P.3d 116, 121 (Ct. App. 2001). Constructions of a statute that would lead to an absurd result are disfavored. *State v. Doe*, 140 Idaho 271, 275, 92 P.3d 521, 525 (2004); *State v. Yager*, 139 Idaho 680, 690, 85 P.3d 656, 666 (2004).

The term "resistance" is not defined in the statute, nor is there any attendant legislative history. We note that at common law a state had to prove beyond a reasonable doubt that the woman resisted her assailant to the utmost of her physical capacity to prove that an act of sexual intercourse was rape--known as the "utmost resistance" standard. Michelle J. Anderson, *Reviving Resistance in Rape Law*, U. ILL. L. REV. 953, 962 (1998). *See also* Joshua Mark Fried, *Forcing the Issue: An Analysis of the Various Standards of Forcible Compulsion in Rape*, 23 PEPP. L. REV. 1277, 1286 (1996); Susan Estrich, *Rape*, 95 YALE L.J. 1087, 1122-23, 1130-31 (1986). Thus, legal decision-makers have historically ignored evidence of a woman's verbal resistance; under the law, verbal resistance was simply inadequate to prove anything. Anderson, *supra*, at 992.

When it became apparent that the "utmost" resistance standard made rape nearly impossible to prove, many states began to abandon the requirement. *Id*. at 964. In its place, some states required that women exert only "earnest" resistance to establish that an act of sexual intercourse was without consent and by force--a standard which remains codified in two states. *Id*. Rejecting the "utmost" and "earnest" resistance requirements, other jurisdictions have moved to require only "reasonable" resistance on the part of the rape victim. *Id*. at 965. This standard, still codified by six states, requires that a woman offer resistance which is "reasonable under the circumstances," and she is not required to actively resist if she reasonably believes that resistance would be useless and would result in serious bodily injury. *Id*. at 965-66.

7

Eventually, however, approximately thirty-two states, the Model Penal Code, the District of Columbia Code, and the Uniform Code of Military Justice eliminated the formal resistance requirement altogether by not mentioning resistance in the statutory language describing rape, allowing prosecutors to establish that a rape occurred even in the absence of any resistance by the woman. *Id*. at 966. Six more states explicitly note in their criminal codes that physical resistance is not required to substantiate a rape charge. *Id.* at 966-67. Thus, Idaho remains one of few states that still statutorily require resistance to prove forcible rape and one of even fewer whose statute does not specify the requisite amount of resistance that will suffice.

While not explicitly addressing the issue, early twentieth-century Idaho cases provide insight into the nature of the statute's resistance requirement. In *State v. Neil*, 13 Idaho 539, 547, 90 P. 860, 862 (1907), the Idaho Supreme Court held that a victim need not resist to the utmost of her ability, thus deviating from the common-law requirement of utmost resistance.[2] The Court further explored the resistance requirement stating: "[t]he importance of resistance by the woman is simply to show two elements of the crime--the assailant's intent to use force in order to have carnal knowledge, and the woman's non-consent." *State v. Andreason*, 44 Idaho 396, 400, 257 P. 370, 371 (1927) (quoting *People v. Norrington*, 202 P. 932, 935 (Cal. Ct. App. 1921)). We interpret these cases as pointing toward a less restrictive interpretation of the resistance requirement than is argued by Jones.

Also helpful in elucidating the issue, we note that Washington's forcible rape statute, like Idaho's, references the "overcoming" of resistance, but does not specify the type and amount of resistance that a victim must employ. Specifically, the Washington statutory scheme defines

---

[2]     Citing Idaho Code § 73-116, Jones contends that we are bound to apply the common law definition of resistance as it existed at the time of the adoption of the rape statute because the Idaho Legislature has not expressly altered Idaho's adherence to this definition. Idaho Code § 73-116 provides:

> The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state.

We note, however, that early case law interpreted "resistance" for purposes of Idaho's rape statute as requiring less than was required at common law. *State v. Neil*, 13 Idaho 539, 547, 90 P. 860, 862 (1907).

"forcible compulsion," referenced in its first and second degree rape statutes, as "physical force which *overcomes resistance* . . . ." WASH. REV. CODE ANN. § 9A.44.010(6) (West 2011) (emphasis added). In interpreting this language, Washington courts have repeatedly held that to prove forcible compulsion, the state need not show that the victim physically resisted, but rather the question of whether resistance occurred is a fact-sensitive determination based on the totality of the circumstances, including the victim's words and conduct. *State v. McKnight*, 774 P.2d 532, 534 (Wash. Ct. App. 1989). In *McKnight*, the court explained the reasoning for holding that a victim need not physically resist:

> The recent trend, in recognition of the fact that a victim's resistance increases the likelihood of the attacker's use of violence, has been either to dispense with the resistance requirement altogether, allowing forcible compulsion to be established solely on a showing of force, *State v. Mackor*, 11 Conn. App. 316, 527 A.2d 710, 714-15 (1987); *People v. Barnes*, 42 Cal. 3d 284, 228 Cal. Rptr. 228, 721 P.2d 110, 117 (1986), or to allow the resistance requirement of forcible compulsion to include resistance manifested by other than physical means. *People v. Dozier*, 85 A.D.2d 846, 447 N.Y.S.2d 35, 36 (1981) (Main, J., dissenting) (under statutory revision defining forcible compulsion to require only "so much resistance as is *reasonable* under the circumstances" resistance is not confined to physical resistance, but includes escaping or crying out, if, under the circumstances, physical resistance would increase the likelihood of violence by the perpetrator); *State v. Reed*, 166 W. Va. 558, 276 S.E.2d 313, 317 (1981) (under statutory definition of forcible compulsion as "force that overcomes such earnest resistance as might reasonably be expected under the circumstances . . . 'resistance' includes physical resistance or any clear communication of the victim's lack of consent.").

*Id.* The court then turned to the facts of the case--the victim, a fourteen-year-old girl, had invited a casual acquaintance, a seventeen-year-old boy, into her home because she was "bored and lonely." The two started kissing, but the victim testified that when she told the defendant to stop he started to slowly push her down on the couch and take off her clothes. She continued to tell him to stop and testified that at this point she was "scared." The defendant then lay on top of her and had sexual intercourse with her. It was undisputed that the victim had not physically resisted the defendant. However, the court concluded, looking at the totality of the facts, that there was sufficient evidence that she had resisted the defendant. Specifically, there was testimony that she was "physically weak" and therefore a reasonable trier of fact could conclude that she was incapable of physically resisting. There was also evidence that she had never dated a boy, it was her first sexual intercourse experience, and she was "unsophisticated and naïve." Therefore, it

9

was reasonable to conclude that she did not fully comprehend what was occurring and that she need only offer resistance commensurate with her limited understanding. The court also noted that although there was no evidence that she had struggled or cried out, she was pushed into a prone position by the defendant, he removed her clothes, she was alone with him, scared, and physically weak, and therefore a reasonable trier of fact could conclude that she did not cry out or struggle, because from her perspective, it may have felt futile. Overall, the court concluded that the victim's resistance was *reasonable under the circumstances* and established the rule that forcible compulsion may be found in the presence of other forms of nonphysical resistance that are "reasonable under the circumstances," given the physical size differences between the victim and perpetrator, the victim's perception of the futility of a physical struggle, and the victim's sense of intimidation and fear. *Id*. at 535.

Given Idaho's statutory and case law history, we, like the Washington court, ascertain that "resist" as it is used in Idaho's forcible rape statute does not require that the victim have *physically* resisted.[3] First and foremost, the plain language of the statute does not indicate that resistance must be physical. In addition, it has also been established that a victim need not resist to the utmost of her ability, *Neil*, 13 Idaho at 541, 90 P. at 862, and that the importance of resistance by the victim is simply to show two elements of the crime--the assailant's intent to use force in order to have sexual intercourse and the victim's non-consent, *Andreason*, 44 Idaho at 399, 257 P. at 371.[4] To interpret the statute rigidly as requiring physical resistance is contrary to the general tenor of these decisions. Accordingly, we hold that whether the evidence establishes the element of resistance is a fact-sensitive determination based on the totality of the circumstances, *including the victim's words* and conduct.

We note that this standard is not a "reasonable" resistance standard which determines the reasonableness of a victim's resistance against an objective standard of reasonableness. Such an approach is problematic because it defeats the very rationale that brought about its existence (in a progression from the utmost resistance standard), which is the fact that not every victim reacts similarly to rape. It is very difficult, if not impossible, to quantify how a rape victim would react

---

[3] We note that Jones cites to no other state which continues to adhere to the common-law requirement that physical resistance must be shown in all cases.

[4] *Neil* and *Andreason* both involved charges of assault with intent to commit rape which required proof of specific intent.

10

under "same or similar circumstances." Fried, *supra*, at 1280 n.22. Rather, the standard we apply includes consideration of the victim's individual characteristics in determining whether she exhibited legally recognizable resistance. In *State v. Juhasz*, 124 Idaho 851, 854, 865 P.2d 178, 181 (Ct. App. 1993), this Court implicitly recognized that such an inquiry was relevant. There, in determining whether a grand jury indictment should be dismissed because alleged irrelevant testimony was introduced, we indicated that the victim's mother's testimony about her thirteen-year-old daughter's level of sexual sophistication, her daughter's embarrassment over the incident, and some of the reasons for her daughter's shyness and social immaturity were relevant to the elements of forcible rape and the thirteen-year-old girl's *ability to resist* an attacker. *Id.*

Turning to the facts of the instant case, we conclude that there was substantial evidence that the jury could find that A.S. resisted Jones's advances. A.S. testified that she "kept yelling at [Jones] and pleading for him to stop and please quit" and was unable to physically resist because he was on top of her, pinning her arms beneath her body. Jones's statements to her afterwards indicate that he knew she did not want to engage in the act--including telling her that he had "lost control." This evidence unequivocally shows that A.S. explicitly communicated to Jones her non-consent to sexual intercourse. Accordingly, we conclude that there was substantial evidence for a reasonable trier of fact to conclude that A.S. "resisted" as required by the statute.

### b. force or violence

Jones also contends there was insufficient evidence to prove that he used force or violence to overcome A.S.'s resistance. Specifically, he notes that there was no evidence presented that he was violent towards A.S., nor that he applied any physical force beyond that required to accomplish the actual penetration. The State counters, contending evidence that Jones pushed A.S. down, pinned her arms under her, adjusted her underwear, and proceeded to engage her sexually was sufficient evidence of force or violence.

While Idaho's forcible rape statute identifies the necessary *effect* of the force (that it overcome the victim's resistance), it does not otherwise indicate the *quantum* of force required. *See* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 17.3(a) (2d ed. 2003). The amount of force required by the forcible rape statute--specifically, whether the force exerted must be more than is inherent in the sexual act--is an issue of first impression in Idaho.

A prominent commentator has noted that because the statutes defining the crime of rape

11

typically do not establish an amount of physical coercion sufficient to demonstrate that sexual activity was accomplished "by force," the requisite degree of force mandated by the courts has been subject to considerable dispute and variation. *Id*. For the most part, however, the treatment by the courts of this issue reflects one of two standards--which represent different approaches to the force element and to the degree and mechanisms of force that the prosecution must show in order to obtain a rape conviction--the intrinsic force standard and the extrinsic force standard. *Id*. The latter approach reflects the more traditional view, which is that the force requirement ordinarily requires proof of use of force or threat of force *above and beyond* that inherent in the act of nonconsensual intercourse, while the intrinsic force standard is the opposite, that force inherent in the act itself suffices. *Id*.

An over one-hundred-year-old United States Supreme Court case, *Mills v. United States*, 164 U.S. 644 (1897), set the precedent that in certain instances, the defendant must have demonstrated force beyond the act of raping the victim in order for a rape conviction to be sustained. This extrinsic force standard is still the most commonly adopted. In *Commonwealth v. Berkowitz*, 641 A.2d 1161 (Pa. 1994), the Pennsylvania Supreme Court applied the standard, holding that the defendant had not committed rape because the victim failed to show that the defendant had used the requisite force or threat of force to compel her to have intercourse.[5] *Id*. at 1166. The victim in the case had entered the defendant's dorm room in search of the defendant's roommate. After locking the door, the defendant sat beside the victim, lifted up her shirt, and fondled her breasts. The victim offered no physical resistance as he proceeded to engage in sexual intercourse with her, but testified that she had repeatedly stated "no" during the encounter. Noting that the issue of force is "relative and depends on the facts of the case," the court determined that the prosecution had not demonstrated the forcible compulsion element, focusing primarily on the actual degree of physical force exerted by the defendant--specifically the precise

---

[5] At the time *Berkowitz* was decided, Pennsylvania's forcible rape statute required that the sexual intercourse occur without the consent of the victim and by "forcible compulsion." *Berkowitz*, 641 A.2d at 1163. A victim need not have resisted and the force necessary to support a conviction of rape need only be such as to establish lack of consent and to induce the victim to submit without additional resistance. *Id.*

12

degree of the shove by which the defendant had put the victim on the bed[6] and whether the untying of her sweatpants was the only physical contact made with the defendant. *Id*. at 1163-64. The court also noted the victim had agreed that the defendant had not verbally threatened her, the defendant's hands were not restraining her in any manner during the actual penetration, and that the weight of his body on top of her was the only force applied. *Id*. at 1164.[7] *Cf. Commonwealth v. Garaffa*, 656 A.2d 133, 136 (Pa. 1995) (distinguishing *Berkowitz* where the defendant had *pushed* the victim down on the bed and the victim had fought the defendant's advances and pushed him away).

The Rhode Island Supreme Court has similarly adopted the extrinsic force standard. In *State v. Jacques*, 536 A.2d 535 (R.I. 1988), the Court interpreted the state's sexual assault statute which provided that "a person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person" and any of several circumstances existed, which in this case was that the defendant used "force or coercion." *Id*. at 537 (quoting R.I. GEN. LAWS, § 11-37-2 (West 2011)). The state's statutory scheme defined "force or coercion" in several ways, the relevant one being that the defendant "overcomes the victim through the application of physical force or physical violence." R.I. GEN. LAWS, § 11-37-1 (West 2011). In interpreting the statute, the Court concluded that proof of force apart from the act of penetration was required under the statute. *Jacques*, 536 A.2d at 537. The Court based this conclusion on the fact that it had previously held that every element necessary to prove rape under the common law must be proved under the sexual assault statute and "[w]ithout question, proof of overcoming the victim's resistance by force, fear, or other prohibited conditions was required under the common law." *Id*. In addition, the Court noted that the sexual assault statute listed other situations in which penetration alone was sufficient for a conviction (those scenarios which did not explicitly require

---

[6]   The court found the following statements by the victim to be especially telling in this regard: "He put me down on the bed. It was kind of like--He didn't throw me on the bed. It's hard to explain. It was kind of like a push but not--I can't explain what I'm trying to say." *Berkowitz*, 641 A.2d at 1164.

[7]   Following the *Berkowitz* decision, the Pennsylvania legislature responded by enacting a statute intended to fill the loophole left by the rape and involuntary deviate sexual intercourse statutes by criminalizing nonconsensual sex where the perpetrator employs little or no force, 18 Pa. C.S.A. § 3124.1 (West 2011), and by defining "forcible compulsion" as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa. C.S.A. § 3101 (West 2011).

"force or coercion") and this fact, combined with the explicit legislative definition of force or coercion, was "an indication . . . that proof of force beyond that which is used in the consummation of the act is required to sustain a conviction for first-degree sexual assault." *Id*. The Court concluded that all of the above factors indicated that the use or threatened use of force must occur before the penetration occurs. *Id*.

Washington courts have also expressly adopted the extrinsic force standard. In *McKnight*, 774 P.2d at 535, the facts of which are described above, the Court of Appeals was called on to interpret the state's second degree rape statute which provides that a person is guilty of the crime when the person engages in sexual intercourse with another person by, among other circumstances, "forcible compulsion." Forcible compulsion was defined, under a statute in effect at the time, as "physical force which overcomes resistance." *Id*. at 533. Defining the requisite force, the court stated:

> The *force* to which reference is made in forcible compulsion "is not the force inherent in the act of penetration but the force used or threatened to overcome or prevent resistance by the female." (Footnote omitted.) 3 C. Torcia, *Wharton's Criminal Law* § 288 at 34 (14th ed. 1980) (citing *Mills v. United States,* 164 U.S. 644, 648-49, 17 S. Ct. 210, 211, 41 L. Ed. 584 (1897)) *cf. People v. Tollack,* 105 Cal. App. 2d 169, 233 P.2d 121, 122 (1951) ("force," as referred to in "forcible compulsion," "implies physical power exerted on a person or thing . . . . The kind of force is immaterial; * * * it may consist of the taking of indecent liberties with a woman, or laying hold of and kissing her against her will."); *Prokop v. State,* 148 Neb. 582, 28 N.W.2d 200, 203, 172 A.L.R. 916 (1947) (the degree of force to constitute common law rape is relative, depending on the circumstances, but must be enough to overcome the victim and have intercourse against her will). Where the degree of force exerted by the perpetrator is the distinguishing feature between second and third degree rape, to establish second degree rape the evidence must be sufficient to show that the force exerted was directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration.

*Id*. at 535. *Accord State v. Bunyard*, 133 P.3d 14, 24-25 (Kan. 2006) (holding that it was a misstatement of the law for the prosecutor to state that the penetration force of defendant's penis into the victim's vagina satisfied the force element of rape charge; rape is defined as "sexual intercourse with a person who does not consent to the sexual intercourse when the victim is overcome by force or fear," and thus the prosecutor improperly equated the "overcome by force or fear" element of rape with the act of sexual intercourse/penetration); *Martin v. State*, 686 A.2d 1130, 1155 (Md. Ct. Spec. App. 1996) (holding that the element of "force or threat of force"

14

obviously means more than the mere physical exertion required to engage in a sexual act against the will and without the consent of the other person); *State v. Kaufman*, 931 N.E.2d 143, 158 (Ohio Ct. App. 2010) (holding that in the context of the forcible rape statute, some amount of force must be proven beyond that force inherent in the crime itself); *Sabol v. Commonwealth*, 553 S.E.2d 533, 536 (Va. Ct. App. 2001) (holding that in the context of rape, force generally requires proof of more than "merely the force required to accomplish . . . the statutorily defined criminal acts"; rather, there must be evidence of "some array or show of force in a form sufficient to overcome resistance").

On the other hand, the adoption of the intrinsic force standard is indicative of a modern trend toward the eradication of the element of force and is most clearly observed in recent court opinions that narrowly construe sexual assault provisions in favor of the victim. Fried, *supra,* at 1300. In New Jersey, for example, forcible sexual assault is defined as "sexual penetration with another person" with the use of "physical force or coercion." N.J. Stat. Ann. § 2C:14-2c(1) (West 2011). Such statutes have traditionally been interpreted as requiring demonstrative force beyond the act of penetration, an interpretation that a lower state court adopted in *In re M.T.S.*, 588 A.2d 1282, 1285 (N.J. Sup. Ct. 1991) (rev'd 609 A.2d 1266 (N.J. 1992), holding that the mere act of penetration itself could not satisfy the element of "physical force or coercion" since such an interpretation would render the statute "meaningless."[8] The New Jersey Supreme Court disagreed, however, adopting the intrinsic force standard which effectively eliminates the need for the prosecution to demonstrate any extra force beyond the actual intercourse with the victim. *In re M.T.S.*, 609 A.2d 1266 (N.J. 1992). In *M.T.S.*, the victim testified that she fell asleep on her bed and awoke to find that her shorts and underwear were removed and the defendant was lying on top of her in the act of penetration. The court first concluded that, as evidenced by disagreements among lower courts and the parties, as well as the variety of possible usages as defined in the dictionary, the statutory words "physical force" did not evoke a single meaning that was obvious and plain, and thus the court had to engage in statutory construction. *Id*. at 1270. The court then traced the history of rape law and its now seemingly arcane requirements which essentially put the victim "on trial" and then, in this context, recognized that the current rape statute had been conceived of as a reform measure which would result in the treatment of

---

[8] *In re M.T.S.* was decided under a previous version of the statute which was, in relevant part, substantially the same as the current sexual assault statute.

rape victims just like those of other violent crimes--an important consideration in understanding the legislative intent and determining the objectives of the law. *Id*. at 1274-75. The court specifically noted that the crime in New Jersey was now defined in terms of the defendant's acts of physical force or coercion without reference to a victim's submission or resistance. *Id*. at 1275. The statute does not refer to force in relation to "overcoming the will" of the victim or the "submission" of the victim and thereby placed primary emphasis on the assaultive nature of the crime, rather than the victim's reaction. *Id*. at 1276.[9]

The court then concluded, for several reasons, including the fact that the elements of non-consent and resistance had been removed from the statute, that the legislature had intended to redefine rape consistent with the law of assault and battery--which require only offensive touching without reference to a degree of force. *Id*. As such, the court reasoned that an interpretation of the statutory crime of sexual assault to require physical force in addition to that entailed in an act of involuntary or unwanted sexual penetration would be fundamentally inconsistent with the legislative purpose to eliminate any consideration of whether the victim resisted or expressed non-consent and would essentially reintroduce a resistance requirement into the sexual assault law. On this basis, the court held that the definition of "physical force" is satisfied under the rape statute if the defendant applies any amount of force against another person in the absence of what a reasonable person would believe to be affirmative and freely-given permission to the act of sexual penetration. *Id*. at 1277. *Accord State v. Sedia*, 614 So. 2d 533, 535 (Fla. Dist. Ct. App. 1993) (recognizing that the Florida Legislature had explicitly adopted the intrinsic force standard); *State v. Chandler*, 939 So. 2d 574, 580 (La. Ct. App. 2006)

---

[9] The *M.T.S.* court noted that the statutory language was in contrast to that in effect in Michigan which defined "force or coercion" as, among other things, where the actor overcomes the victim through the actual application of physical force or physical violence. *See People v. Patterson*, 410 N.W.2d 733, 735 (Mich. 1987). In *Patterson*, the Michigan Supreme Court considered the sufficiency of the evidence of force or coercion in the prosecution of a sexual contact charge against a defendant who had placed his hands on the genital area of a seventeen-year-old girl while she was sleeping. The majority concluded that the defendant had not used force as required by the statute because there was no evidence of physical overpowering and there was no submission. *Id*. at 740. The dissent criticized the majority as a distortion of the legislature's intent to protect the sexual privacy of persons from the use of force, coercion, or other undue advantage. *Id*. at 747 (Boyle, J. dissenting). Concluding that the statute did not require a showing of any extra force, the dissent pointed out that in defining force by measuring the degree of resistance by the victim, the majority had effectively reintroduced the resistance requirement, when the focus should be on whether the contact was unwanted. *Id*. at 747-49.

(holding that the aggravated rape statute does not require the defendant's use of force other than the inherent egregious force of the rape itself).

While generally considered progress in the area of rape law reform, the intrinsic force standard essentially renders the issue of force moot, instead shifting the analysis to the issue of consent. Fried, *supra,* at 1297-98. It removes rape from the special category of violent crimes where most courts have pigeonholed it, placing it in the group of assaultive crimes where contact is measured by its unlawfulness and not by the degree of forcefulness. *Id.* at 1298. In this sense, it is incompatible with Idaho's statutory scheme, which places significant emphasis on the element of force--prescribing that it must be sufficient to "overcome" a victim's resistance and which has not been subject to the rape law reforms seen in much of the country. In the case at issue here, the nonconsent of the victim was certainly at issue--in the form of whether she resisted--especially where the two were adults that had engaged in a prolonged consensual sexual relationship and had engaged in consensual sex, in regard to Count I, mere minutes before.

Most courts with similar language to that found in Idaho's rape statute, requiring that the force or violence "overcome" resistance, have interpreted their statutes to require extrinsic force. Quite simply, this terminology implies that force other than that inherent in the proscribed sexual act be used to overcome a victim's resistance--implying that the force must occur before penetration. *See*, *e.g.*, *Commonwealth v. Wallace*, 922 N.E.2d 834, 839 (Mass. App. Ct. 2010) (interpreting rape statute to mean the Commonwealth must prove that the defendant *compelled* the victim to submit by force and against his will). The Idaho Legislature has not undertaken the rape law reform that characterizes those states which have departed from the traditional extrinsic force standard. Thus, we conclude that the extrinsic force standard is applicable in regard to Idaho's forcible rape statute.

In the conduct charged as Count I here, it is undisputed that the extent of Jones's physical contact with A.S. during the incident, aside from penetration, was coming up from behind her, laying on top of her, pushing her down from being propped up on her elbows, thus causing her arms to be pinned beneath her by his body weight, and moving her underwear aside. Accordingly, we must determine whether Jones exerted the requisite force beyond penetration to overcome A.S.'s resistance.

One criticism of the extrinsic force standard is that it is inherently more ambiguous than the intrinsic force standard because it requires more evidence and naturally gives rise to the

question of just how much more will suffice. LAFAVE, *supra*, § 17.3(a). Another commentator has noted that because the "distinction between the 'force' incidental to the act of intercourse and the 'force' required to convict a man of rape is one commonly drawn by courts," it "would seem to require the courts to define what additional acts are needed to constitute prohibited rather than incidental force." Estrich, *supra,* at 1107. As a result, the outcomes are generally all over the map, with the degree of force required varying from state to state and generally being a function of the facts and circumstances of each case. Fried, *supra,* at 1300.

For example, on one end of the spectrum is the holding in *Berkowitz*, 641 A.2d at 1164, where the Pennsylvania Supreme Court held that the requisite force had not been shown where the defendant had not verbally threatened the victim, the defendant's hands were not restraining her in any manner during the actual penetration, and the weight of his body on top of her was the only force applied. On the other hand, numerous jurisdictions have found the requisite force under circumstances similar to those in *Berkowitz.* In *Jacques,* 536 A.2d at 538, after adopting the extrinsic force standard as we discussed above, the Rhode Island Supreme Court applied the standard to the facts of the case. There, the defendant who was allegedly performing a photo shoot, instructed the victim to walk to a wing-back chair, which was against the wall opposite the desk. As she proceeded toward the chair, the defendant told her that he was getting excited by her body. The victim testified that at this point she became very frightened. As she arrived at the chair, she felt the pressure of the defendant's chest pushing against her back. This pressure caused her to fall into a kneeling position onto the chair facing the wall, after which he sexually assaulted her. On appeal, the defendant contended that he had not exerted the requisite force to be convicted of first degree sexual assault. The Supreme Court disagreed, noting that "the force of [the defendant's] chest pushing against her caused her to kneel in the chair" such that "[a]s a result of [the defendant's] approach from the rear, [the victim] was forced into a position of helplessness" and that "[o]nce [the victim] was in this position, [the defendant] moved to the attack." *Id*. *Accord State v. Lynch*, 19 A.3d 51, 57 (R.I. 2011) (holding that uncontroverted evidence that a 200-pound middle-aged male defendant had constrained a 120-pound teenager with both of his arms-- exerting a degree of pressure such that the victim could not move--while performing oral sex on the victim was sufficient evidence of "force").

18

In *McKnight*, 774 P.2d 532, the facts of which are discussed above, the Washington Court of Appeals similarly found the defendant had imposed the requisite force. Applying the extrinsic force standard to the facts of the case, the court stated:

> Reasonable minds can differ as to whether the acts of slowly pushing [the victim] to a prone position and then removing her clothes in response to the victim's requests that the advances stop manifest a degree of force greater than that which is inherent in the act of intercourse. A reasonable juror could, however, infer from the evidence that these were *acts of force over and above what is necessary to achieve intercourse and that these acts were employed to overcome [the victim's] resistance*. The evidence, when taken as a whole and viewed in a light most favorable to the prosecution, establishes that the act of intercourse was accomplished by the use of force.

*Id*. at 536 (emphasis added). *Cf. State v. Ritola*, 817 P.2d 1390, 1392 (Wash. Ct. App. 1991) (distinguishing *McKnight* and holding there was no forcible compulsion in a case where the defendant had reached out and grabbed the victim's breast because there was no evidence that the forced used was more than the force necessary for the sexual act and/or that it was used to overcome resistance because he caught the victim by surprise and she had no time to resist).

While we are not bound by the above-described cases, we find their holdings, excepting *Berkowitz*,[10] to be persuasive. As a whole, we conclude that these jurisdictions have not interpreted the extrinsic force standard to require significant impositions of force above, for example, the pushing of a victim into a prone position or down on her knees, the removal of the victim's clothes and/or underwear, or the weight of a defendant's body on top of the victim, where they were taken over the victim's verbal and/or physical resistance and lead to subsequent sexual acts. This leads us to conclude that in this case, reasonable minds could have determined that Jones utilized more force in addition to that inherent in the sexual act and thus satisfied the force element. Jones's use of his body weight on top of A.S. to push her down from having been propped up on her arms and to pin her arms beneath her, rendered her unable to physically resist or escape his grasp and overcame her verbal resistance. Like in *Jacques*, A.S. was "forced into a position of helplessness" by Jones, after which he initiated the sexual act--to which A.S. had

---

[10]     *Berkowitz* has been subject to considerable criticism, and as noted above, the Pennsylvania legislature responded to the case by criminalizing the act that the court had concluded was not covered by the forcible rape statute.

clearly communicated her resistance and non-consent. We conclude that there was sufficient evidence to satisfy the resistance and force elements of Count I.

### 2. Count II

Jones also contends that the evidence presented was insufficient to support a conviction for forcible rape on Count II. Specifically, he contends that there was no evidence of resistance because A.S. never even verbally communicated to him that she did not want to engage in sexual activity, nor was there evidence that he used force or violence to overcome any resistance. Because we conclude that the resistance element is dispositive, we do not reach the issue of force in regard to this count.

Even applying Idaho's resistance standard, which credits verbal resistance as well as physical resistance, there was simply no evidence presented at trial that A.S. resisted in any manner. A.S. testified she had pretended to be asleep and had not said anything to Jones during the entirety of the incident and explained that she believed that if she lay still, he would leave her alone. After he was finished, she testified that Jones had "woken her up" and tried to get her to go into the bathroom--thus also implying that she had not expressed anything during the incident since he believed she was asleep. She also stated that she had not fought Jones because she was scared and because "the first time I kept begging and pleading, and he just wouldn't quit." While we certainly recognize that A.S. testified that Jones's sexual advances were unwanted, we are constrained to apply the statute under which he was charged--which specifically includes a resistance requirement. As such, we conclude that there was insufficient evidence to support a conviction for Count II.

### B. Admission of Telephone Call Recording

Jones also contends the district court erred when it overruled his objection and admitted an un-redacted version of the telephonic confrontation call recording into evidence. Specifically, Jones contends that the court erred in admitting A.S.'s accusation that Jones thinks it is "ok" to have intercourse with people who are unconscious, A.S.'s allegation that he had engaged in that behavior previously with M.C., and Jones's admission, in response to A.S.'s prodding, that he was already on felony probation for domestic battery based on similar circumstances. He also contends it was error to admit his statement that he would have to register as a sex offender

based on A.S.'s allegations and his admission that he had done "bad things" in the past, including "hurt[ing] [M.C.]" and committing prior DUI offenses.[11]

Jones contends that in failing to redact these statements, the district court "ignored" its prior ruling regarding the admissibility of the prior bad acts evidence involving M.C. where it had determined the bad acts evidence was not admissible because it demonstrated a mere propensity or bad character rather than a common scheme or plan. In addition, Jones argues that because the references on the tape to Jones's prior bad acts were highly prejudicial, and because there was no showing of an allowable purpose for admission under Idaho Rule of Evidence 404(b), the court erred in not redacting the tape to exclude references to prior bad acts.

Jones also contends the court erred in admitting the recording in its entirety when it determined that under I.R.E. 403, the potential for undue prejudice did not substantially outweigh its probative value. Jones argues that the tape contains "numerous allegations of, and statements regarding, uncharged misconduct that were of little or no relevance and were highly prejudicial."

Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's criminal propensity. I.R.E. 404(b); *State v. Needs*, 99 Idaho 883, 892, 591 P.2d 130, 139 (1979); *State v. Winkler*, 112 Idaho 917, 919, 736 P.2d 1371, 1373 (Ct. App. 1987). However, such evidence may be admissible for a purpose other than that prohibited by I.R.E. 404(b). *State v. Avila*, 137 Idaho 410, 412, 49 P.3d 1260, 1262 (Ct. App. 2002). In determining the admissibility of evidence of prior bad acts, the Supreme Court has utilized a two-tiered analysis. The first tier involves a two-part inquiry: (1) whether there is sufficient evidence to establish the prior bad acts as fact; and (2) whether the prior bad acts are relevant to a material disputed issue concerning the crime charged, other than propensity. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). In this case, Jones does not challenge the existence of the prior bad act as an

---

[11] The State contends that Jones' arguments on appeal fail because he did not object to several of the statements below and therefore they are not preserved for appeal. The State also contends that Jones' arguments on appeal fail because the statement that he did object to below was not offered for the truth of the matter asserted and therefore did not fall within the purview of I.R.E. 404(b). The State's arguments in this regard are unavailing. First, we conclude that defense counsel's objection to the playing of the unredacted tape was sufficient to encompass an objection to all of the portions of the tape in which references to Jones' past behavior toward M.C. was referenced. Second, whether evidence was admitted to prove the truth of the matter asserted is irrelevant when analyzing its admissibility under I.R.E. 404(b).

established fact. Therefore, we address only the second part of the first tier--the relevancy determination. When considering admission of evidence of prior bad acts, we exercise free review of the trial court's relevancy determination. *Id.*

The second tier in the analysis is the determination of whether the probative value of the evidence is substantially outweighed by unfair prejudice. *Id.* When reviewing this tier we use an abuse of discretion standard. *Id.* When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

As Jones points out, earlier in the trial the district court had already ruled that, pursuant to I.R.E. 404(b), the State could not introduce the testimony of M.C., who would have testified that she had been involved in a long-term sexual relationship with Jones and that it was common for him to repeatedly pressure her to have sexual intercourse to the point where she would relent. She would have also testified as to two specific incidents that occurred shortly after the couple had broken up. In the first, Jones attempted to sexually assault her, but he showed remorse and she did not report it. In the second, a few days later, Jones allegedly forced her to engage in sexual intercourse, for which he was charged with forcible rape. It resulted in a mistrial and then his eventual plea of guilty to felony domestic battery. The State argued that these events were admissible as to the issues of consent (apparently to show that A.S. did not consent to the acts), an absence of mistake on Jones's part (in thinking that the instances were consensual), and a common scheme or plan of exploitation where Jones follows a "common tactic" of gaining trust in intimate relationships, using this trust to engage in sexual assaults, and then shows remorse. Having previously expressed skepticism that the prior bad acts established a unique pattern of behavior, the district court ruled that the State could not present the testimony of M.C. in its case-in-chief because while there were similarities between the incidents, the court was unsure that the testimony was relevant to facts at issue in the current trial.

Given this conclusion, we are unable to account for why the district court did not exclude the references to this prior misconduct in the tape on the basis of its prior I.R.E. 404(b) ruling--especially where the allegations at issue were of exactly the same nature as those it had

22

excluded under its prior ruling. We need not address the merits of this determination, however, because the court clearly erred in its finding as to the second tier in the analysis--the determination of whether the probative value of the evidence is substantially outweighed by unfair prejudice. In this regard, the court stated:

> I don't think it should be redacted. In the first place, he's not--as far as I know . . . this is a rape allegation that was without her consent. I don't believe this is a rape allegation that she was unconscious at the time. . . . I don't see how this is prejudicial. And clearly you could have made this motion a lot earlier. But I don't see that this is that prejudicial.
> Furthermore, whatever relevancy it might have it certainly is not outweighed by any unfair prejudice to your client. I mean, as far as I know this is not a rape case about, you know, over the course of their relationship he was having sex with her while she was asleep.

Having listened to the tape, we conclude that the district court's conclusion that the prejudicial effect of the specific portion of the tape at issue did not substantially outweigh its probative value, and thus need not be redacted, was an abuse of discretion. Initially, we note that the court did not make an explicit finding regarding the evidence's probative value, but it did reference the fact that the allegation in this case went to the issue of sexual intercourse without consent while the prior bad act referenced in the call went to sexual intercourse while the victim was unconscious--and therefore its prejudicial effect was diminished. We fail to see, however, how this fact mitigates against prejudice. To the contrary, it demonstrates a lack of any probative value as actual circumstances in the case were so dissimilar. The evidence is also significantly prejudicial to the defendant. An assertion, and Jones's admission, that he had sexual intercourse with M.C. while she was sleeping, that this was a "bad thing" that he had done, and that he was on felony probation for such an act, is a classic example of evidence which poses the danger that it will stir the passion of the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial. *See State v. Stoddard*, 105 Idaho 533, 537, 670 P.2d 1318, 1322 (Ct. App. 1983). Therefore, we cannot say that the district court reached its conclusion by an exercise of reason and we conclude that its finding in this regard was an abuse of discretion.

However, error is not reversible unless it is prejudicial. *Stoddard*, 105 Idaho at 171, 667 P.2d at 274. With limited exceptions, even constitutional error is not necessarily prejudicial error. *Id.* Thus, we examine whether the alleged error complained of in the present case was

23

harmless. *See State v. Lopez*, 141 Idaho 575, 578, 114 P.3d 133, 136 (Ct. App. 2005). To hold an error harmless, this Court must declare a belief, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of contributed to the conviction. *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010); *State v. Sheldon*, 145 Idaho 225, 230, 178 P.3d 28, 33 (2008).

After a review of the record, we conclude that the error was harmless as to Count I. As we recognized above, the evidence was certainly prejudicial, but significantly more so concerning Count II. This is so because the facts of Count II involve A.S. "pretending" to be asleep and therefore, is more like the bad acts referred to in the tape than the circumstances surrounding Count I, which unequivocally occurred while A.S. was alert and verbally resisting.

In addition, the evidence of Jones's guilt on Count I was compelling, especially taking into account Jones's repeated admissible statements showing his consciousness of guilt. Specifically, in the recorded conversation, when faced with A.S.'s accusations regarding the first incident, Jones repeatedly failed to deny that he had proceeded in spite of A.S.'s indications that she did not want to engage in intercourse. For example, after the two discussed the incident giving rise to Count II, with A.S. insisting that she was awake, she asked why Jones would "go there again," presumably referencing the first incident, to which he responded "I don't know. I'm not sure." She then indicated that he had sent her "all those text messages . . . promising me it wouldn't happen again" following the first incident, to which he responded, "I know, I'm sorry. It's just, I love being with you." In addition, A.S. stated that she had told him "no" during the first incident and then asked him why he had still continued to which he answered, "I don't know. . . . I feel bad about it." When A.S. said, "You knew I didn't want to go there. I told you I didn't want to go there. Why would you do that?" he responded, "I don't know. I'm frustrated that I can't be with you I guess." A.S. also indicated that she had "begged" and "pleaded" with Jones to stop during the first incident, a point which he did not refute.

As Jones points out, A.S.'s credibility was subject to some doubt given that she had withheld information from law enforcement and had recanted several times. However, defense counsel thoroughly cross-examined her regarding these discrepancies, which essentially encompassed the entirety of his defense. On the other hand, the State presented A.S.'s detailed testimony that she had resisted Jones's advances and that he had overcome that resistance by force, as well as the phone call recording which unequivocally indicated that Jones had not

denied having done so when confronted. In light of this largely unrefuted evidence, we conclude that the inadmissible references on the tape, while prejudicial, did not contribute in any meaningful manner to Jones's conviction of Count I. Accordingly, we conclude that the erroneous admission of Rule 404(b) evidence on the tape was harmless error.

## III.

## CONCLUSION

We conclude there was sufficient evidence to convict Jones of Count I because there was evidence by which a reasonable trier of fact could find that A.S. offered "resistance" and that Jones overcame this resistance by "force or violence." However, there was insufficient evidence to find that A.S. resisted in regard to Count II and we vacate this conviction. Further, while the district court erred in admitting prior bad acts evidence in a recording played for the jury, the error was harmless because we are convinced beyond a reasonable doubt that there is no reasonable possibility that the complained of statements contributed to Jones's conviction of Count I. Accordingly, we affirm Jones's conviction as to Count I.

Judge LANSING and Judge MELANSON **CONCUR.**