STATE

v.

Norman JACQUES.

No. 86–442–C.A.

Supreme Court of Rhode Island.

Feb. 10, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Jane M. McSoley, Asst. Attys. Gen., for plaintiff.

Edwin H. Hastings, Tillinghast, Collins & Graham, Providence, Philip J. Hirschkop, Virginia, for defendant.

## OPINION

KELLEHER, Justice.

This is an appeal by the defendant, Norman Jacques, from a conviction by a Superior Court jury of a charge that he engaged in sexual penetration of a female through the use of force or coercion, a violation of G.L.1956 (1981 Reenactment) § 11–37–2. Hereafter we shall refer to the defendant by his last name, Jacques, and to the complaining female by a pseudonym, Kathy.

The gist of Jacques's appeal is that the trial justice erred in denying his motion for judgment of acquittal. Jacques's appellate counsel argues vigorously that there is no evidence to suggest that the intercourse complained of was a result of "force or coercion" used by Jacques as that phrase is defined in § 11–37–1.

When considering a motion for judgment of acquittal, a trial justice is to view only that evidence which the prosecution claims is capable of supporting proof beyond a reasonable doubt. Such evidence is to be considered in the light most favorable to the prosecution, and both the trial justice and this court on appeal must draw from such evidence all reasonable inferences that are consistent with the guilt of the accused. At this point neither the weight

of the evidence nor the credibility of witnesses need be considered. *State v. Wilshire,* 509 A.2d 444, 452 (R.I.1986). With these principles in mind, we now turn to the evidence.

On Labor Day, September 6, 1982, Kathy was a new arrival to the city of Providence, having moved to Rhode Island the day before the episode giving rise to the charges now before us. In the spring of 1982, she graduated from a Massachusetts junior college and had been accepted for admission to the junior class at the Rhode Island School of Design (RISD). Classes at RISD were scheduled to begin the following Tuesday, September 7. On Labor Day afternoon, Kathy set out on a walk through Providence's metropolitan area looking for The Living Room—a local nightclub and popular gathering place for RISD students. Her goal was to find the club while it was still daylight so that she could return later that evening. Although the record indicates that The Living Room is situated on Promenade Street in Providence, somehow Kathy lost her way and ended up in Providence's Federal Hill section, which is some distance south of Promenade Street.

As Kathy was walking along some unidentified street, Jacques drove up alongside her in his Toyota Land Cruiser and brought the vehicle to a stop. He gave Kathy a business card that identified him as the editor and publisher of the *Rhode Island Times*, a newspaper. Jacques told Kathy that she was beautiful and would be a perfect subject for a photographic project that he was planning for his newspaper.

As conversation continued, Kathy mentioned her predicament and Jacques offered her a ride to The Living Room. Kathy hesitated but finally took the front seat of the Toyota, alongside Jacques, who then drove onto a nearby highway. Over Kathy's protests, Jacques did not bring her to The Living Room; instead he brought her to his "treehouse" studio. He told her he needed to take some test photos of her for the proposed project.

After traveling approximately fifteen minutes, the couple arrived at Jacques's home and studio, which are situated north of Providence in the town of Lincoln. They entered the one-room studio, which is located behind Jacques's residence. According to Kathy, the studio was in a remote area up on an incline surrounded by trees, and the view from the windows gave her the feeling she was in a treehouse.

As they engaged in conversation, Jacques showed Kathy around the studio. (The record indicates that the studio was approximately twelve x fourteen feet.) At one point Jacques sat down in a chair in front of a desk, which was attached to the wall, and asked Kathy to step away from him so that he could see if she was suitable for modeling. After again complimenting Kathy on her beauty, Jacques asked to see any scars or blemishes she might have. Kathy lowered the top of her pedal-pushers a bit to show him a scar she had on her abdomen. Jacques then told Kathy to drop her pedal-pushers to the ground so that he could see the outline of her body. Kathy initially replied in the negative but then complied after Jacques, in a disturbed voice, said that such a response indicated that she was incapable of handling matters on a "professional level." After Kathy lowered her pedal-pushers to her ankles, Jacques removed her underpants, saying that it was silly of her to keep them on. Then Jacques asked Kathy to remove her upper garment, and she complied.

At Jacques's direction, Kathy walked to a wing-back chair, which was against the wall opposite the desk. As she proceeded toward the chair, Jacques told Kathy that he was getting excited by her body. Kathy testified that at this point she became very frightened. As she arrived at the chair, Kathy felt the pressure of Jacques's chest pushing against her back. This pressure caused her to fall into a kneeling position onto the chair facing the wall. Then she felt Jacques's penis make contact with her vaginal area, and she immediately stiffened her body and screamed, "What are you doing?". Jacques kept trying to insert his penis as Kathy continued to scream and cry. Jacques then abandoned the penile approach, but before Kathy could move, Jacques inserted one, then two of his fin-

gers into her vagina. Kathy immediately squirmed away from this contact as Jacques yelled at her, telling her that she was immature and that she should grow up. After resisting several other advances, including a request by Jacques that she perform oral sex on him, Kathy moved to the other side of the room and made herself presentable for public viewing. Kathy then asked to be taken home, a request with which Jacques eventually complied.

The jury returned a guilty verdict, and Jacques's motion for a new trial was subsequently denied.

Jacques was found guilty of violating § 11–37–2(C), which provides:

"A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, not the spouse of the accused, and if any of the following circumstances exist:

\* \* \* \* \* \*

(C) The accused uses force or coercion."

■ "Force or coercion" is defined in § 11–37–1 to mean any of the following: "(A) uses or threatens to use a weapon, or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

(B) overcomes the victim through the application of physical force or physical violence.

(C) coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes that the accused has the present ability to execute these threats.

(D) coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the accused has the ability to execute this threat."

The first issue presented to us is whether proof of force apart from the act of penetration is required under the sexual-assault statute. The state argues that requiring force in addition to nonconsensual intercourse would lead to ludicrous results. It contends that the force sufficient to ac-

complish an act of intercourse may constitute sufficient force to support a conviction for sexual assault.

This contention is not well taken. In *State v. Babbitt,* 457 A.2d 1049 (R.I.1983), this court held that every element needed to prove rape under the common law must also be proved under the sexual-assault statute. Without question, proof of overcoming the victim's resistance by force, fear, or other prohibited conditions was required under common law. *See State v. Golden,* 430 A.2d 433, 435 (R.I.1981).

Referring to the sexual-assault statute, the *Babbitt* court wrote:

"[I]t is quite obvious that the common-law crime of rape was embodied in the new statute. A parallel reading of the two statutes clearly indicates that every element needed to prove a violation under the old statute for rape is also needed to prove first-degree sexual assault under the new statute." 457 A.2d at 1054.

In addition, § 11–37–2 lists other situations in which penetration alone is sufficient for a conviction. This fact, coupled with the explicit legislative definition of force and coercion, is an indication to us that proof of force beyond that which is used in the consummation of the act is required to sustain a conviction for first-degree sexual assault. All of these factors suggest that the use or threatened use of force must occur before the penetration occurs.

Whereas Jacques is correct in saying that the common-law requirement of force, or the threatened use thereof, was incorporated into the sexual-assault statute, we disagree with his conclusion that no evidence was presented of his use of force apart from force that might have been used in the consummation of the act. We turn now to a discussion of the meaning of force or coercion.

■ After a careful reading of the definitions of force or coercion found in § 11–37–1, we have no doubt that parts 1(A) and 1(D) of that statute are inapplicable to the fact pattern presented in this

case. There is no evidence to suggest that Jacques used or threatened to use a weapon or coerced Kathy to submit by threatening to commit a future murder, to kidnap or to inflict serious bodily injury upon Kathy or any other person.

We are further of the opinion that § 11–37–1(C) is not applicable to the facts of the case before us especially in light of our discussion of that section in *State v. Burke*, 522 A.2d 725 (R.I.1987).[1] There is no evidence that Jacques actually threatened Kathy at any time during the incident, and we are not willing to extend the *Burke* analysis of implied threats to the facts in this case.

 However, we are of the firm belief that the record in this case contains sufficient evidence for a jury to determine whether the mandates of § 11–37–1(B) had been satisfied. To fall within the parameters of § 11–37–1(B), a defendant must overcome the victim through the application of physical force or violence. In his brief, Jacques's counsel has included numerous decisions by other courts that appear to suggest that bodily harm or great physical resistance must be exhibited by the victim before the requirement of force or violence is satisfied. We disagree. Although some of Kathy's conduct on that fateful afternoon might be considered foolhardy and naive, she is not on trial here. We focus our concern on what Jacques did or did not do, not on how Kathy should have responded.

In *State v. Carvalho*, 122 R.I. 461, 467, 409 A.2d 132, 135–36 (1979), this court emphasized that

"[t]oday the law does not expect a woman, as part of her proof of opposition or lack of consent, to engage in heroics when such behavior could be useless, fruitless, or foolhardy. * * * *All that is required is that the woman offer such resistance as seems reasonable under all the circumstances.*" (Emphasis added.)

Here, we are not faced with a situation in which the victim did not resist. Instead the record indicates that Kathy resisted a great deal. Initially she protested the trip to Lincoln once Jacques failed to abide by his bargain to drop her off at The Living Room. On arriving at the studio, Kathy initially refused to remove her clothing and did so only after having been verbally intimidated by Jacques's yelling. After disrobing, Kathy was directed by Jacques to walk over to the wing-back chair against the wall. The force of Jacques's chest pushing against her caused her to kneel in the chair. As a result of Jacques's approach from the rear, Kathy was forced into a position of helplessness. Once Kathy was in this position, Jacques moved to the attack. He attempted to insert his penis into her vagina several times. Kathy screamed, cried, and tightened her body so that Jacques was foreclosed from entering. After several failed attempts at penile penetration, because of Kathy's resistance, but before Kathy was able to assume a position whereby she could defend herself, Jacques thrust two of his fingers into her vagina. Kathy quickly squirmed away from this contact. She also resisted several other advances made by Jacques, including a request that she perform oral sex on him. The record clearly indicates that Kathy did all that might be required of her. In the position in which she was placed, she could not kick, hit, or otherwise defend herself against Jacques's unwanted advances.

 We note that the type of penetration is unimportant under the sexual-assault statute. The fact that only digital penetration occurred does not lessen Kathy's fear and humiliation. Under the sexual-assault statute, every male and female has an interest in bodily integrity. That integrity is violated regardless of the type or length of time of the penetration.

---

1. In *State v. Burke*, 522 A.2d 725 (R.I.1987), this court ruled that G.L.1956 (1981 Reenactment) § 11–37–1(C) included implied threats as well as actual threats. In its decision, the court relied heavily on the facts that the defendant was a uniformed police officer armed with handcuffs and a gun who used his position of authority to intimidate a young woman who suffered from alcoholism to perform oral sex upon him.

In his charge to the jury, the trial justice correctly set forth the factors to be considered when determining whether physical force or coercion was used by Jacques as he approached Kathy from the rear and caused her to assume a kneeling position on the chair. The sexual assault was completed once Jacques's fingers penetrated into Kathy's vagina. The trial justice's denial of the motion for a judgment of acquittal on this record was well warranted.

■ Jacques's complaint about the denial of his motion for new trial has little merit. The trial justice explicitly stated that here credibility was at issue. Jacques testified that no sexual intercourse occurred at the treehouse. Thus, the jury was confronted, as was the trial justice, with a direct conflict in evidence. Here the trial justice clearly believed Kathy's version of what happened and pointed out that Jacques was less than truthful in his testimony at trial. Admittedly, the only testimony relative to the sexual act came from Kathy. However, it is to be noted that in *State v. Wiggin*, 106 R.I. 69, 73, 256 A.2d 219, 221 (1969), this court emphasized that a victim's testimony concerning a rape need not be corroborated.

Here the trial justice discharged his duties in conformity with the principles set forth in *State v. McMaugh*, 512 A.2d 824, 830 (R.I.1986), and his rejection of the new-trial motion will not be disturbed.

Accordingly, Jacques's appeal is denied and dismissed. The judgment of conviction is affirmed.[2]

2. After arguments were heard in this controversy the court, on the motion of Jacques's appellate counsel and over the state's objection, permitted the defense to supplement the record by the inclusion of an affidavit executed by a former assistant attorney general who had initially interviewed Kathy. This individual states as his recollection that Kathy told him that she did not scream or cry for help because it would have been futile for her to do so since no one would have been able to hear her screams. The attorney general, on the other hand, points out that Kathy's inconsistencies were demonstrated at trial through cross-examination by defense counsel who directed the jury's attention to the fact that Kathy never mentioned to the Lincoln police investigator that she had screamed during her encounter with Jacques. In explaining this omission Kathy, on cross-examination, said "I might have told him, I don't know if I told them." She also conceded that if the investigator did not write the word "scream," "I probably did not use that word." Cross-examination did, however, indicate that the term used in the police report was that she began to "whimper." It is obvious that the jury was well aware of the inconsistencies relative to whether she screamed or cried once Jacques had pushed her onto the chair. Here the affidavit contains material which is cumulative at best but does not require the grant of a new trial. *State v. Brown*, 528 A.2d 1098 at 1104 (R.I.1987).