**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 39519**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | **Boise, January 2013 Term** |
| | ) | |
| v. | ) | **2013 Opinion No. 40** |
| | ) | |
| RUSSELL G. JONES, | ) | **Filed: April 1, 2013** |
| | ) | |
| Defendant-Appellant. | ) | **Stephen W. Kenyon, Clerk** |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Elmore County. Hon. Cheri C. Copsey, District Judge.

Judgment of conviction for two counts of rape, <u>affirmed in part</u> and <u>reversed in part.</u>

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Sarah E. Tompkins argued.

Honorable Lawrence G. Wasden, Attorney General of Idaho, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

J. JONES, Justice.

Russell G. Jones appealed his conviction by an Elmore County jury on two counts of rape. The case was initially heard by the Idaho Court of Appeals, which affirmed on one count and reversed on the second.[1] Jones sought review, which we granted in order to consider the force and resistance necessary with respect to a charge of forcible rape.

**I.**
**FACTUAL AND PROCEDURAL HISTORY**

In the spring of 2008, Jones, Craig Carpenter, and the victim, A.S., were longtime friends. Carpenter and A.S. were engaged and had children together but, unbeknownst to Carpenter, Jones and A.S. had been sexually involved for approximately four years. On May 22,

_____

[1] It should be noted that the Court of Appeals was correct in its analysis and conclusions. Therefore, we have borrowed generously from its opinion.

1

2008, after spending the night together in Jackpot, Nevada, A.S. and Jones drove back to Idaho and decided they would end their affair. But despite this, they returned to A.S.'s apartment and engaged in consensual sex that morning.

Afterwards, A.S. went to the bathroom and then returned to the bedroom, where Jones was looking at pornographic material on the computer. Jones sat next to A.S. on the bed and started touching her, and she responded by telling him that "I thought we had decided that the time before . . . was the last time and it wasn't going to happen anymore." A.S. stated that at that point:

> I was laying on my stomach on the bed, and [Jones] got behind me. And I wasn't sure what he was doing, and I got up on my elbows to see what he was doing, and he was undoing his pants. . . . I told him, no, that I wasn't going to do this, and I looked back down, and that's when he leaned forward, and I was pushed down, like this, to where I couldn't get up, and he started having sex with me.

A.S. clarified that when she stated she was pushed down "like this" she meant that Jones "leaned forward to where his body was pushing on [hers]" and that her "hands were underneath [her] and she couldn't turn around." Jones then moved A.S.'s underwear to the side and had intercourse with her, while she "kept yelling at him and pleading for him to stop and please quit," which he ignored. Jones apologized to A.S. afterwards, asked her if she was okay, and admitted that he "lost control." He stated that if A.S. "wanted to press charges that [she] could because he was out of line." After Jones eventually left, A.S. contacted the Boise State University Women's Center. She told a counselor that she had been raped and was advised to call the police, which she did not do. Thereafter, A.S. continued to be in contact with Jones and subsequently went to Jackpot with him again.

On May 27, Jones went to A.S.'s apartment to watch movies. He spent the night and remained there in the morning after Carpenter left for work and A.S.'s children went to school. At the time, A.S. was taking an antihistamine for a bee sting and a prescription anti-anxiety medication, both of which caused her to feel drowsy. As a result of her drowsiness she laid down on the living room couch and started to "drift off." Jones went into the living room, sat next to her, and started stroking her hair. A.S. testified that after he "grabbed a handful of hair and pulled" hard enough to hurt her, she was nonresponsive in hopes that "if [she] just laid there and didn't move he would leave [her] alone." She further stated that:

> After he was done pulling my hair, he left me alone for a little bit. And then he grabbed my chest and squeezed my breast really hard. . . . He apparently didn't get the reaction he wanted, and he moved down to my vaginal area. . . . He started touching me outside, and then he started putting his fingers inside me really hard.

Jones then proceeded to pull down A.S.'s pants and underwear, and "pushed [her] legs apart and started having sex with [her]." In response, A.S. "just froze," and testified that she was "paralyzed" with fear.

Afterwards, Jones and A.S. went to the bedroom and shared a cigarette. Jones helped A.S. into bed and once again started to have sexual intercourse with her. She testified that:

> [A]bout a little ways into it he stopped, and then he said, "Baby, I do have a problem." He said, "What am I doing?" . . . He got off me and pulled his clothes back on and put mine back on. And then he sat me back up and asked me if he could have sex with me. And I just kept saying over and over again, no, my kids are going to be home soon.

Eventually, Jones left the apartment.

A.S. drove to Carpenter's brother's house and told the brother's girlfriend that she had been raped. They took A.S. to the hospital where she told the staff that she had been sexually assaulted, but that she did not want to press charges. But law enforcement was contacted, and A.S. provided a statement to police while at the hospital.

On May 29, A.S. met with a detective, who arranged for A.S. to make a recorded call to Jones. A.S. confronted Jones regarding the incidents, and Jones is heard on tape apologizing for both incidents, conceding that he "continued" with sexual intercourse despite her protests in the first incident and her not responding during the second and admitting that after the first incident he sent her text messages[2] "promising [her] it wouldn't happen again." Additionally, A.S. is clearly heard saying, "You think this is okay to do to people who are unconscious? Apparently

---

[2] The text messages sent by Jones to A.S. were written down by Detective Bob Chaney and admitted into evidence:

> May 22 1116: I'm so sorry yet Another Fuck up I'm good at it I'm in ur Hands tell me what to do
> May 22 1130: I lost control, seem to be doing that alot lately
> May 22 1132: Its my fault neither can I
> May 22 1134: That scared me what should I do
> May 22 1137[:] Please don't hate me, I hate myself
> May 22 1148[:] I Take Full Responsibility if u want 2 press charges I understand I took From someone I Love
> May 23 256[:] Im sorry I have not been better 2u I hate what ive become

you've done this to [M.C.][3] before, and now you did it to me." In response, Jones says that he was already on felony probation for domestic battery and that he would have to register as a sex offender based on these new accusations. Jones also admits, when asked to describe the bad things he did in the past, that he had "hurt [M.C.]" and had also committed driving under the influence (DUI) offenses. Toward the end of the tape, A.S. asks Jones to describe what he did to her—he states that: "I think that I pushed things too far and I guess it's rape. I did it. You obviously didn't want any part of it."

Based on the May 22 incident in the bedroom (Count I) and the May 28 incident on the couch (Count II), Jones was charged with two counts of forcible rape under I.C. § 18-6101(3).[4] At trial, A.S. testified regarding the events of both days. She admitted she had never informed police that she and Jones were sexually involved during the four years prior to the incidents. She also admitted her statements to the police were incomplete—specifically, she did not reveal that she and Jones had had consensual sex earlier in the day on May 22. Moreover, although she had shared text messages from Jones that she thought were incriminating, she did not show officers text messages sent by her to Jones that indicated that she loved him (and that would have revealed their relationship). A.S. also admitted that even at the time of trial, she was still concealing her relationship with Jones from Carpenter.

During cross-examination, defense counsel focused on a letter that A.S. wrote, had notarized, and gave to the prosecution before trial. In it, she recanted her allegations of rape, asserted that Jones was wrongfully charged, and characterized the incidents as a misunderstanding between her and Jones. But A.S. subsequently sent another letter to the prosecutor that retracted her retraction—she maintained that counseling had induced a change of heart and that she indeed wished to go forward with the charges.

The State then presented the testimony of the nurse who examined A.S. after the second incident. The nurse stated that A.S. was "visibly frightened" during their interaction: crying, avoiding eye contact, and speaking very softly. During the examination, A.S. "had her knees to her chest, kind of holding herself" and afterwards she laid down and "just kind of curled up."

---

[3] M.C. was Jones' former girlfriend.
[4] Idaho Code § 18-6101 was amended in 2010 and subsection (3) was redesignated as subsection (4). There was no change in the wording of the subsection. The statutory reference in this opinion will be to I.C. § 18-6101(3), which was the correct citation at the time Jones was charged.

The nurse further testified that she found no physical evidence of trauma consistent with rape—there was no bruising, scrapes, or scratches on A.S.'s body.

Just prior to the presentation of the State's final witness and the introduction of the taped confrontation call into evidence, Jones objected, stating that the tape should be redacted. Specifically, he sought to remove a statement implying he had sex with M.C. while she was asleep. The district court ruled that the tape should not be redacted because it reasoned that:

> In the first place, . . . this is a rape allegation that was without [A.S.'s] consent. I don't believe that this is a rape allegation that she was unconscious at the time. So that's—I don't see how this is prejudicial. And clearly you could have made this motion a lot earlier. But I don't see that this is that prejudicial.
>
> Furthermore, whatever relevancy it might have it certainly is not outweighed by any unfair prejudice to your client. I mean, as far as I know this is not a rape case about, you know, over the course of their relationship he was having sex with her while she was asleep.

The State then called its final witness, detective Bob Chaney, who met with A.S. following the incidents and who arranged the taped call to Jones. That tape was played in its entirety for the jury. Detective Chaney then testified that he read and copied several text messages from Jones to A.S, which were admitted into evidence, but that he did not inspect any messages sent from A.S. to Jones—including those in which she told Jones that she loved him. He was unaware that Jones and A.S. had been in a long-term consensual sexual relationship, and that the two had engaged in consensual intercourse on May 22, prior to the first incident. Chaney testified that the lab report he received following A.S.'s examination yielded no traces of semen.

Jones moved for a directed verdict at the close of evidence, alleging that the State failed to prove: 1) that A.S. resisted sexual intercourse and 2) that her resistance was overcome by force. The district court denied the motion, and the jury convicted Jones of both counts of forcible rape. He was sentenced to concurrent 25-year sentences, with five years determinate for each. Jones appealed.

On appeal, the Court of Appeals determined that verbal resistance was sufficient to substantiate a charge of forcible rape and further concluded that the force overcoming that resistance would need to be greater than the force inherent in sexual intercourse. The Court applied these standards and affirmed the Count I conviction, but reversed on Count II. The Court

further held that the district court's decision to admit the un-redacted tape into evidence was harmless error. Jones petitioned for, and we granted, review.

## II.
## ISSUES ON APPEAL

I.  Whether there is sufficient evidence to support a conviction for forcible rape as alleged in Count I.
II.  Whether there is sufficient evidence to support a conviction for forcible rape as alleged in Count II.
III.  Whether the district court erred in admitting the un-redacted tape into evidence.

## III.
## DISCUSSION

### A. Standard of Review.

When reviewing a Court of Appeals decision, "this Court gives serious consideration to the views of the Court of Appeals, but reviews the district court's decision directly." *State v. Corbus*, 150 Idaho 599, 602, 249 P.3d 398, 401 (2011); *State v. Lampien*, 148 Idaho 367, 371, 223 P.3d 750, 754 (2009).

In assessing the sufficiency of evidence, we "will uphold a judgment of conviction entered upon a jury verdict so long as there is substantial evidence upon which a rational trier of fact could conclude that the prosecution proved all essential elements of the crime beyond a reasonable doubt." *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009). "Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been prove[n]." *Id*. On appeal, this Court must view the evidence in the light most favorable to the prosecution. *State v. Sheahan*, 139 Idaho 267, 286, 77 P.3d 956, 975 (2003). Further, we "will not substitute our own judgment for that of the jury on matters such as the credibility of witnesses, the weight to be given to certain evidence, and the reasonable inferences to be drawn from the evidence." *Severson*, 147 Idaho at 712, 215 P.3d at 432.

A district court's decision to admit evidence is reviewed for an abuse of discretion. *State v. Thorngren*, 149 Idaho 729, 731, 240 P.3d 575, 577 (2010). Generally speaking, the lower court has sole discretion in deciding whether to admit or exclude evidence. *State v. Howard*, 135 Idaho 727, 731, 24 P.3d 44, 48 (2001). But, this discretion is not unlimited. The trial court must exercise reason in its decision making. *Id.* Nonetheless, this "broad discretion in the admission of evidence at trial will be reversed only where there has been a clear abuse of that discretion." *Id.* at 732, 24 P.3d at 49.

If no objection is made to a trial court's decision to admit evidence, then the issue is not preserved and may only be considered on appeal if it constitutes "fundamental error." *State v. Perry*, 150 Idaho 209, 224–26, 245 P.3d 961, 976–78 (2010). In that case, "the appellate court's authority to remedy [the] error is strictly circumscribed to cases where the error results in the defendant being deprived his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal." *Id.* at 224, 245 P.3d at 976.

### B. There was sufficient evidence to convict Jones on Count I.

The first question before this Court is whether there is sufficient evidence that Jones forcibly raped A.S. on May 22. Resolving this brings up two broader issues: whether verbal resistance qualifies as resistance under Idaho's forcible rape statute and the amount of force required to overcome this resistance.

Jones argues that scant Idaho case law illuminates the meaning of "force" and "resistance" and that "unless and until the [L]egislature affirmatively modifies the common law" of forcible rape, this Court must adhere to the common law understanding that "some quantum of physical resistance is required." He claims that A.S's purely verbal resistance to Jones on May 22 would be insufficient to support a charge of forcible rape. Jones additionally contends that the "extrinsic force standard" should apply, i.e., that a charge of forcible rape requires more force than is inherent in the sexual act. He asserts there was no evidence that he used any force that exceeded what "was required to achieve penetration." As he puts it:

> [A.S.] was already lying outstretched in a prone position on her stomach on the bed immediately prior to the intercourse at issue . . . . Given her physical position, it was necessary for Mr. Jones to position himself on top of [A.S.] in order to accomplish penetration. Additionally, [A.S.] testified that her arms were already underneath her prior to the intercourse—Mr. Jones did not physically hold her arms down or place her arms where they were pinned underneath [A.S.'s] body. . . . Finally, the act of pulling aside [A.S.'s] underwear was also incidental to the act of penetration.

Jones thus posits that the State failed to provide evidence of resistance or force that would support a conviction for the forcible rape charge in Count I.

With regard to resistance, the State responds that this Court has not followed the common law standard of "resistance to the utmost" for "at least 105 years," citing *State v. Neil*, 13 Idaho 539, 90 P. 860 (1907), and *State v. Andreason*, 44 Idaho 396, 257 P. 370 (1927). It argues that in Idaho the resistance factor exists "simply to show two elements of the crime—the assailant's

intent to use force in order to have carnal knowledge and the woman's nonconsent." (quoting *Andreason*, 44 Idaho at 396, 400, 257 P. at 371). Because A.S. said no and "was effectively prevented from further resistance by being pushed onto the bed with her arms pinned," the State contends that there was sufficient evidence of resistance. Further, with regard to force, the State argues against the extrinsic force standard. Its contention is that "the only 'quantum' of force required by the statute is that necessary to 'effect' the penetration over the victim's resistance." The State argues that that much force was present here. We will first address the resistance issue.

### 1. Resistance.

The Court freely reviews issues of statutory interpretation. *State v. Forbes*, 152 Idaho 849, 851, 275 P.3d 864, 866 (2012). "When [this] Court must engage in statutory construction, it has the duty to ascertain the legislative intent and give effect to that intent." *Id.* In order to ascertain the intent of the Legislature, "not only must the literal words of the statute be examined, but also the context of those words, the public policy behind the statute and its legislative history." *Id.*

The Idaho Code defines forcible rape as follows:

Rape is defined as the penetration, however slight, of the oral, anal or vaginal opening with the perpetrator's penis accomplished with a female under any one (1) of the following circumstances:
. . . .
(3) Where she resists but her resistance is overcome by force or violence.

I.C. § 18-6101(3).

The term "resistance" is not defined in the statute and there is no legislative history to provide guidance. Thus, we begin our review by considering the common law. *See* I.C. § 73-116. "At common law, [a] state had to prove beyond a reasonable doubt that the woman resisted her assailant to the utmost of her physical capacity to prove that an act of sexual intercourse was rape." Michelle J. Anderson, *Reviving Resistance in Rape Law*, U. ILL. L.REV. 953, 962 (1998); *see also* Joshua Mark Fried, *Forcing the Issue: An Analysis of the Various Standards of Forcible Compulsion in Rape*, 23 PEPP. L.REV. 1277, 1286 (1996); Susan Estrich, *Rape*, 95 YALE L.J. 1087, 1122–23, 1130–31 (1986). Thus, under the utmost-physical-resistance standard, "verbal resistance was simply inadequate to prove anything." Anderson, *supra*, at 992.

8

The utmost-resistance requirement, beyond producing some severely inequitable results at trial,[5] proved to be nearly impossible to establish. Anderson, *supra*, at 964 (noting that under it, even "if a woman struggled to the utmost of her physical capacity until doing so appeared futile to her, and only then acquiesced to the rapist's advances, she . . . was not raped"). Thus, the utmost-resistance standard has since been abandoned to varying degrees. *See People v. Yanik*, 43 N.Y.2d 97, 99, 400 N.Y.S.2d 778, 779, n.1 (1977) ("The [utmost-resistance] standard has been rejected by almost every other court that has considered the question."). Approximately thirty-two states, the Model Penal Code, the District of Columbia Code, and the Uniform Code of Military Justice have done away with the resistance requirement completely, allowing prosecutors to establish a rape without any resistance present. *See* Cal. Penal Code § 261; Wash. Rev. Code Ann. § 9A.44.040; Model Penal Code § 213.1; D.C. Code § 22-3002; 10 U.S.C. § 920(a). Six more states' criminal codes expressly state that physical resistance is not required for a rape conviction. *See, e.g.*, Alaska Stat. Ann. § 11.41.470(8)(a) (noting that, "'without consent' means that a person . . . with or without resisting, is coerced by the use of force against a person").

As the State notes, Idaho began its departure from the common law rule about 105 years ago. In *Neil*, this Court examined a charge of assault with intent to commit rape, and particularly, the defendant's argument that in order to prove every element of rape, "the state must show . . . that the female 'showed the utmost reluctance and used the utmost resistance.'" We rejected that approach in this oft-quoted passage:

> A large number of authorities are cited by counsel for appellant, to the effect that the state must show in such cases that the female "showed the utmost reluctance and used the utmost resistance." *De Voy v. State*, 99 N.W. 455, 122 Wis. 148. To our minds the trouble with a number of these authorities is that they reverse the order of the inquiry. They go about inquiring into the kind, character, and nature of the fight put up by the woman, rather than the nature of the assault and evident and manifest purpose and intent of the assailant. For the purpose of reaching the conclusions announced in some of these cases, it is necessary to assume that, in the first place, a man has a right to approach a woman, lay hold on her person,

---

[5] This is exemplified by the outcome in *Brown v. State*, 106 N.W. 536 (Wis. 1906). There, the victim testified that:

> I tried as hard as I could to get away. I was trying all the time to get away just as hard as I could. I was trying to get up; I pulled at the grass; I screamed as hard as I could, and he told me to shut up, and I didn't, and then he held his hand on my mouth until I was almost strangled.

*Id.* Despite this, the Court held that the victim had not sufficiently resisted, because she only yelled "let me go" once, her screams were inarticulate, and she failed to resist with "hands and limbs and pelvic muscles." *Id.*

take indecent liberties with her, and that, unless she "kicks, bites, scratches, and screams" (*People v. Morrison*, 1 Parker Cr. R. [N. Y.] 625) to the "utmost of her power and ability," she will be deemed to have consented, and indeed to have invited the familiarity. Such is neither justice, law, nor sound reason.

13 Idaho at 547–48, 90 P. at 862. This early departure from the utmost resistance requirement gained much favorable comment. *See, e.g.*, *People v. Norrington*, 202 P. 932, 935 (Cal. App. 1921) (stating that "[o]ur views upon this phase of the case are so admirably expressed by the Idaho Supreme Court").

This Court reaffirmed *Neil*, and clarified the meaning of the resistance requirement, in *State v. Andreason*. There, the appellant was walking with a woman who he forcibly pulled toward him. 44 Idaho at 399, 257 P. at 370. She tried to get away, and they fell on the ground, at which point he "placed his hand over the girl's mouth when she attempted to scream, and while holding her on the ground, raised her dress." *Id.* But she managed to get up, pushed the appellant away, and ran to safety. *Id.* After escaping, "one of her arms was bleeding, her dress was torn, and she was bereft of one shoe"—she testified "that she was completely exhausted from the scuffle, and that perhaps she could not have gotten away if appellant had not wanted to let her go." *Id.* at 399, 257 P. at 370–71.

The appellant in *Andreason* argued that "the law [requires] an intent to accomplish the act [of rape] in spite of any resistance that the victim may put forth." *Id.* at 400, 257 P. at 371. Or, in other words, he argued that because the woman escaped his assault, or because he relented and "wanted to let her go," that he had not assaulted her with intent to commit rape. *Id.* at 399–400, 257 P. at 370. The Court characterized his argument as "a misconception, or at least an overemphasis, as to the necessity for resistance on the part of the woman attacked." *Id.* at 400, 257 P. at 371. We then clarified, "The importance of resistance by the woman is simply to show two elements of the crime—the assailant's intent to use force in order to have carnal knowledge, and the woman's nonconsent." *Id.* We held that if the "appellant finally desisted in his efforts to accomplish the object which the jury found he had intended, and that [because he ended] the encounter . . . he did not consummate his purpose, this would not justify the conclusion of an absence of a lecherous desire before he withdrew from the struggle." *Id.* at 401, 257 P. at 371. The Court held there was sufficient evidence to uphold a verdict of assault with intent to commit rape. *Id.* at 401–02, 257 P. at 371.

Based on the case law developed beginning with *Neil*, Idaho Criminal Jury Instruction 904, entitled "Resistance to Rape," provides, "Although [the victim] must have resisted the act of penetration, the amount of resistance need only be such as would show the victim's lack of consent to the act." That instruction was given in this case. The comment to the instruction says:

> In Idaho, the rape victim is not required to resist to the utmost of the victim's ability. *State v. Neil*, 13 Idaho 539, 90 P. 860 (1907). The importance of resistance by the victim is simply to show two elements of the crime—the assailant's intent to use force in order to have sexual intercourse and the victim's non-consent. *State v. Andreason*, 44 Idaho 396, 357 P. 370 (1927). *See also, State v. Fowler*, 13 Idaho 317, 89 P. 757 (1907); *State v. Lewis*, 96 Idaho 743, 536 P.2d 738 (1975); *State v. Robran*, 119 Idaho 285, 805 P.2d 491 (Ct. App. 1991); *State v. Gossett*, 119 Idaho 581, 808 P.2d 1326 (Ct. App. 1991).

Given the plain language of Idaho's forcible rape statute and Idaho's well-established case law regarding resistance, we hold the statute does not require that rape victims resist to their utmost physical ability and that verbal resistance is sufficient resistance to substantiate a charge of forcible rape. For one thing, there is no language in I.C. § 18-6101(3) requiring "physical" resistance. The statute only requires "resistance." It does not differentiate between physical or verbal resistance. Furthermore, *Neil* and *Andreason* have expressly rejected the common law utmost physical resistance standard. As a result, the English common law regarding forcible rape has not applied in Idaho for over a century. Therefore, in this State verbal resistance is sufficient for a charge of forcible rape. Whether the evidence establishes the element of resistance is a fact-sensitive determination based on the totality of the circumstances, including the victim's words and conduct.

Beyond this, allowing verbal resistance to support a charge of forcible rape is sound policy. Requiring physical resistance by a rape victim naturally "increases the likelihood of the attacker's use of violence." *State v. McKnight*, 774 P.2d 532, 534 (Wash. App. 1989) (where the court found "no rational basis for requiring resistance to be manifest in all cases by physical means, and in fact, [was] persuaded that public policy considerations militate against such a requirement"); *see also People v. Barnes*, 721 P.2d 110, 119 (Cal. 1986) (citing studies reporting that "the likelihood of receiving injuries requiring medical treatment nearly doubled when victims resisted assailants" and that "resistance is inadvisable since it may provoke greater injury").

11

The State highlights the inequity of requiring physical resistance in situations in which the victim is restrained and unable to physically resist, as was the case here. It argued that because "Jones applied sufficient force to effectively prevent physical resistance" by A.S., it would be a "miscarriage of justice" to then hold that forcible rape did not occur due to merely verbal resistance. We agree. As this Court observed in *Neil*, an inquiry "into the kind, character, and nature of the fight put up by the woman, rather than the nature of the assault and evident and manifest purpose and intent of the assailant," is in effect, backwards. *Neil*, 13 Idaho at 547–48, 90 P. at 862.

Based on the evidence before it, the jury certainly had sufficient basis to find that on May 22, A.S. resisted Jones' advances. She testified that she "kept yelling at him and pleading for him to stop and please quit, and he just kept ignoring her." When asked if she tried to "strike out," she responded that "[she] couldn't," because "[her] hands were pinned down, and Jones' weight was on [her] on the bed." In sum, A.S.'s verbal resistance, in the form of repeated pleas for Jones to stop, was sufficient evidence of resistance under I.C. § 18-6101(3).

### 2. Physical force or violence overcoming resistance.

The next issue before us is the meaning of "force or violence" overcoming resistance, for the purposes of I.C. § 18-6101(3). There are two primary approaches for addressing this issue: the extrinsic force standard, which defines "force" as anything beyond that which is inherent or incidental to the sexual act itself and the intrinsic force standard, which deems the force inherent in intercourse as sufficient to substantiate a charge of forcible rape.

The extrinsic force standard is the traditional view and "is still the most commonly adopted." *See also Stokes v. State*, 648 So.2d 1179 (Ala. Crim. App. 1994); *State v. Parish*, 405 So.2d 1080 (La. 1981); *State v. Soderquist*, 816 P.2d 1264, 1266 (Wash. App. 1991); *Martin v. State*, 686 A.2d 1130, 1155 (Md. Spec. App. 1996); *State v. Kaufman*, 931 N.E.2d 143, 158 (Ohio App. 2010); *Sabol v. Commonwealth*, 553 S.E.2d 533, 536 (Va. App. 2001). The standard, as stated by the Washington Court of Appeals in *McKnight*, is that:

> The *force* to which reference is made in forcible compulsion "is not the force inherent in the act of penetration but the force used or threatened to overcome or prevent resistance by the female." . . . Where the degree of force exerted by the perpetrator is the distinguishing feature between second and third degree rape, to establish second degree rape the evidence must be sufficient to show that the force exerted was directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration.

*McKnight*, 774 P. 2d at 535 (citations omitted). The primary justification for the extrinsic force standard seems to be textual. That is, if a forcible rape statute by definition requires penetration, then for an additional requirement of force to be meaningful, it necessarily must mean some force beyond that inherent in penetration.

This reasoning was echoed by the Supreme Court of Rhode Island in *State v. Jacques*, 536 A.2d 535 (R.I. 1988). There, the state argued that "the force sufficient to accomplish an act of intercourse may constitute sufficient force to support a conviction for sexual assault." *Id.* at 537. Or, in other words, it advocated that the court adopt an intrinsic force standard. The court refused, and concluded that "every element needed to prove" forcible rape must be shown by the state. *Id.* The court also pointed out that Rhode Island's rape statute "lists other situations in which penetration alone is sufficient for a conviction"—implying that had penetration alone been sufficient for a charge of forcible rape, the extra element of force would not have been added. *Id.* The court reaffirmed the extrinsic force standard, and required the state to show "proof of force beyond that which is used in the consummation of the act." *Id.*

The intrinsic force standard, on the other hand, represents the more modern trend. It provides that any amount of force—even that which is inherent in intercourse—can substantiate a charge of rape. The seminal case adopting this standard is *In re M.T.S.*, 609 A.2d 1266 (N.J. 1992). In *M.T.S.*, the Supreme Court of New Jersey considered "whether the element of 'physical force' is met simply by an act of non-consensual penetration involving no more force than necessary to accomplish" the act. *Id.* at 1267. There, the victim had been sleeping, and woke up to realize her clothes were removed, and that the assailant was on top of her, in the act of penetration. *Id.* at 1268. After examining the state's "reformed statute," which defined rape without reference to a victim's resistance or submission, the court there found that:

> The understanding of sexual assault as a criminal battery, albeit one with especially serious consequences, follows necessarily from the Legislature's decision to eliminate non-consent and resistance from the substantive definition of the offense. Under the new law, the victim no longer is required to resist and therefore need not have said or done anything in order for the sexual penetration to be unlawful. The alleged victim is not put on trial, and his or her responsive or defensive behavior is rendered immaterial. We are thus satisfied that an interpretation of the statutory crime of sexual assault to require physical force in addition to that entailed in an act of involuntary or unwanted sexual penetration would be fundamentally inconsistent with the legislative purpose to eliminate any consideration of whether the victim resisted or expressed non-consent.

13

*Id.* at 1276–77. Other jurisdictions, with similar statutes, have adopted the intrinsic force standard. *See State v. Sedia*, 614 So.2d 533, 535 (Fla. App. 1993); *State v. Chandler*, 939 So.2d 574, 580 (La. App. 2006).

Based on the plain language of I.C. § 18-6101(3), we hold that the extrinsic force standard applies in Idaho. Section 18-6101(3) defines forcible rape as "penetration, however slight," "[w]here [a woman] resists but her resistance is overcome by force or violence." Were we to construe "force" as encompassing the act of penetration itself, it would effectively render the force element moot. Force would *always* be present and never have to be proven, so long as there was sexual intercourse. Generally speaking, "it is incumbent upon a court to give a statute an interpretation which will not render it a nullity." *Hecla Mining Co. v. Idaho State Tax Comm'n*, 108 Idaho 147, 151, 697 P.2d 1161, 1165 (1985). Thus, in order to give full effect to the complete text of the statute, we adopt the extrinsic force standard. Beyond this, the intrinsic force standard is typically instituted in jurisdictions where the legislature has stepped in to amend its rape statute. But in Idaho, the Legislature has not undertaken any such reform. We must work within the confines of the statute as written. Thus, we conclude that some force beyond that which is inherent in the sexual act is required for a charge of forcible rape.

Even with the extrinsic force standard, a jury had sufficient evidence before it to conclude beyond a reasonable doubt that Jones used force that overcame A.S.'s resistance. This is because Jones used more force than is inherent in the sexual act during the incident on May 22. As A.S. testified, Jones "leaned forward" and she "was pushed down . . . to where [she] couldn't get up"; he "leaned forward to where his body was pushing on [hers]," pinning her hands underneath her so she could not turn around; and he removed her underwear to the side. Jones argues that all these actions were merely incidental to the act of intercourse. But Jones' use of his body weight to trap A.S.'s hands under her, and effectively forestall any struggle, seems in particular less "incidental" to sex and far more like force employed to overcome her resistance. Thus, a jury could well have found beyond a reasonable doubt that Jones used force to overcome A.S.'s resistance during the incident on May 22. Because both the resistance and force elements were present for this incident, we hold that there is sufficient evidence to sustain a conviction for forcible rape, and accordingly affirm Count I.

**C. Because A.S. neither physically nor verbally resisted sexual intercourse on May 28, there was insufficient evidence to convict Jones on Count II.**

14

Jones contends that there was insufficient evidence to support a conviction for forcible rape on Count II, particularly that A.S. never even verbally communicated to him that she did not want to engage in sexual activity or that he used force or violence to overcome any resistance. The State counters that "A.S.'s resistance was in feigning sleep—passive resistance," and that this was enough to show A.S.'s lack of consent to intercourse during the May 28 incident. Jones replies that "the States' position that non-resistance is proof of resistance," is untenable, not in accord with the plain language of 18-6101(3), and would effectively render the explicit resistance requirement a nullity.

We hold that there is insufficient evidence to support a charge of forcible rape based on Count II. By her own admission, A.S. "didn't respond" physically, or even verbally, to Jones' advances on May 28—she "just froze." Idaho's forcible rape statute expressly requires resistance. Satisfying this element with inactivity strains the definition of resistance, essentially nullifying the resistance requirement. Though studies have shown that "freezing up" is indeed a legitimate, understandable reaction of victims of sexual assault,[6] this Court has no authority to jettison the resistance requirement—modifying this State's statutes is the Legislature's province alone. As the statute is plainly written, some quantum of resistance is required, and A.S. did not resist Jones' advances on May 28. There was insufficient evidence on the element of resistance to support the conviction of forcible rape on Count II so we need not consider the issue of force. The conviction on Count II is accordingly reversed.

## D. The admission of the unredacted tape into evidence is not reversible error.

The final issue is whether the admission of the unredacted tape into evidence was an error requiring reversal. Jones argues that given the damaging admissions on the tape, the lack of physical evidence, and A.S.'s credibility issues at trial, that "it cannot be said, beyond a reasonable doubt, that there was no reasonable possibility that admission of the un-redacted recording . . . did not contribute" to Jones' convictions. The State responds that Jones incorrectly

---

[6] *See Barnes*, 721 P.2d at 118−19. ("For example, some studies have demonstrated that while some women respond to sexual assault with active resistance, others 'freeze.' . . . One researcher found that many women demonstrate 'psychological infantilism'—a frozen fright response—in the face of sexual assault. . . . The 'frozen fright' response resembles cooperative behavior. . . . Indeed, . . . the 'victim may smile, even initiate acts, and may appear relaxed and calm.' . . . Subjectively, however, she may be in a state of terror. [Also] the victim may make submissive signs to her assailant and engage in propitiating behavior in an effort to inhibit further aggression. . . . These findings belie the traditional notion that a woman who does not resist has consented. They suggest that lack of physical resistance may reflect a 'profound primal terror' rather than consent.") (citations omitted).

considered the prejudicial effect of the entire tape, despite the fact that Jones only objected to a single portion of it at trial. The State further avers that the district court did not err in admitting the tape, and alternatively, if it did err, that doing so was harmless.

"Evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's criminal propensity. I.R.E 404(b); *State v. Needs*, 99 Idaho 883, 892, 591 P.2d 130, 139 (1979). But this evidence may be used for purposes other than those prohibited by I.R.E. 404(b). *State v. Avila*, 137 Idaho 410, 412, 49 P.3d 1260, 1262 (Ct. App. 2002). This Court uses a two-tiered analysis to review a trial court's decision to admit evidence of prior bad acts:

> First, the trial court must determine whether there is sufficient evidence to establish the other crime or wrong as fact. . . . The trial court must also determine whether the fact of another crime or wrong, if established, would be relevant . . . .

> Second, the trial court must engage in a balancing under I.R.E. 403 and determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence.

*State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009) (citations omitted). The first-tier relevancy determination is freely reviewed, and the second-tier balancing decision is reviewed with an abuse of discretion standard. *Id*. For the latter, this Court asks: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

Before analyzing whether admitting the unredacted tape constituted error, it must be noted that in his briefing Jones objects to the admission of a host of statements found on the tape. Particularly, Jones takes issue with his taped admissions that he slept with M.C. "while she was sleeping," that he was on probation for domestic battery, that he had "hurt" M.C., and that he had previously been convicted of driving under the influence. However, Jones did not object to all these statements at trial—he only objected to the admission of his statement that he had slept with M.C. while she was sleeping. After the district court agreed that a possibly prejudicial phrase written on the tape itself should be redacted, the following exchange occurred:

> THE COURT: But other than [the phrase written on the tape] there's nothing on the tape that you're going to be objecting to?

> [Counsel for Jones] MR. BISHOP: No.

Subsequently at trial, after the district court apparently ruled that M.C. would not be allowed to testify, and just prior to the introduction of the tape, its actual contents were then brought up:

> MR. BISHOP: Your Honor, we have an issue with regards to the tape. First of all, the tape is going to be played . . . . And, in light of the court's ruling on the 404(b) [motion], there was *one statement that I bring to the attention of the court*. There's a reference about a question by [A.S.] in regards to, has anything like this occurred or something or other, and she makes reference to an incident with [M.C.] who was the individual on the 404. It is about thirty seconds of that tape?
>
> [Counsel for the State] MS. SCHINDELE: Yeah, it's not a very long—and I am not even sure—I can't remember exactly where in the 53 minutes it is.
>
> MR. BISHOP: So that is on the tape. And in light of the decision, I think that should be redacted out.
>
> THE COURT: I am trying to figure out why it should be redacted . . . . What exactly is said so that I know?
>
> MS. SCHINDELE: Your Honor, if I recall—I was looking for the exact language. I had it written down. If I recall correctly, [A.S.] asks, so have you ever done this before? And I believe there is a negative answer, and then she says, what about with [M.C.]? And I think the defendant's answer is something about he had sex with her one time while she was sleeping . . . . It's something along that line.
>
> THE COURT: All right. I don't think that is—I don't think it should be redacted.

(emphasis added). Based on Jones' prior statement that he had no objection to the contents of the tape, and his subsequent narrow objection to "one statement" found therein, he only preserved an objection to the tape's single colloquy regarding Jones' prior act with M.C. while she slept. While this Court may review unpreserved issues on appeal, it can only do so when the error is fundamental—and "abuse of discretion in admitting evidence is a trial error" that "would not constitute fundamental error." *State v. Cannady*, 137 Idaho 67, 72–73, 44 P.3d 1122, 1127–28 (2002). We simply review the decision to admit Jones' admission that he slept with M.C. while she slept and will not address any additional unpreserved objections.

Turning to the admission of the statement on the tape, the district court concluded that the tape's prejudicial effect did not substantially outweigh its probative value. The district court based its decision to admit the tape on the dissimilarity of the incidents between Jones and M.C., and between Jones and A.S. Thus, the court stated that "whatever relevancy [the tape] might

17

have is certainly not outweighed by any unfair prejudice to [Jones]" because "this is not a rape case about, you know, over the course of [Jones' and A.S.'s] relationship he was having sex with her while she was asleep." The exchange in question went as follows:

[A.S.]: Have you ever done (inaudible) with Stacy when she was . . .

Jones: No!

[A.S.]: And [M.C.]? And you told me that you never did this but now I have a hard time believing it. Have you ever done this before?

Jones: No, I have not. I guess when you get accused of it for so long you turn that way. I don't know. I . . . I don't even know myself anymore. The only thing I did with [M.C.] was sleep with her while she was sleeping. That pissed her off.

[A.S.]: So you did the same thing to her you did to me?

Jones: Um.

[A.S.]: You thought I was asleep.

Jones: I didn't think you were asleep.

We find no fault with the district court's determination that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. For one thing, someone can "sleep with someone" in two, completely different senses—everyone that shares a bed with someone is "sleeping with" that person; but not everyone who shares a bed with someone is having intercourse with that person, consensual or otherwise. Thus, Jones' admission that he "[slept] with [M.C.] while she was sleeping" does not necessarily amount to a confession that he had sex with her while she was asleep. A further dissimilarity with the situation involving M.C. is Jones' statement that he did not think A.S. was asleep.

However, the district court omitted an important step in its analysis. The court made passing reference to "whatever relevancy" the statement may have, but did not actually consider its relevance. The district court should have done so and its failure to do so constitutes error. Whether one considers the statement in either of the two senses mentioned above, it is difficult to see how it is relevant.

The State asserts that, even if the district court erred in admitting the statement, the error was harmless. We agree. Even assuming that Jones was stating that he had sex with M.C. while

she was sleeping, and that the jury interpreted it this way, this lone statement would not be particularly prejudicial, given the host of other properly admitted evidence of Jones' guilt. The evidence against Jones was compelling—he made "repeated admissible statements showing his consciousness of guilt" and sent text messages to A.S. admitting that he lost control. There was A.S.'s detailed testimony that she resisted Jones' advances and that he overcame those advances by force, which he clearly did not deny during their taped phone call. There were the taped statements to which Jones did not object: Jones' admissions of being on probation for domestic battery, of hurting M.C., and of his previous D.U.I. offenses. At one point in the tape Jones even admits: "I think that I pushed things too far, and I guess it's rape. I did it. You obviously didn't want any part in it." Moreover, although A.S.'s credibility was called into question, given that she withheld information from law enforcement and recanted the allegations at one point, she was cross-examined vigorously on these points. In short, given the weight and quantity of the unrefuted evidence across the board, versus the one statement regarding Jones and M.C., the statement did not prejudice Jones with respect to Count I. The district court erred in admitting the statement, but we find that the error was harmless.

## IV.
## CONCLUSION

We affirm Jones' conviction on Count I, and reverse his conviction on Count II.


Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.